```
              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA


 * * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,        )  Criminal Action
                                 )  No. 21-620
vs.                              )
                                 )
ANTHONY VUKSANAJ,                )  April 29, 2022
                                 )  9:41 a.m.
               Defendant.        )  Washington, D.C.
 * * * * * * * * * * * * * * * *
```

**TRANSCRIPT OF SENTENCING HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**


<u>**APPEARANCES**</u>:

```
FOR THE GOVERNMENT: ALISON PROUT
                    DOJ-USAO
                    Northern District of Georgia
                    Richard B. Russell Federal Building
                    75 Ted Turner Drive, SW
                    Atlanta, GA 30303
                    (404) 581-6105
                    Email: alison.prout@usdoj.gov


FOR THE DEFENDANT:  NATHAN I. SILVER
                    6300 Orchid Drive
                    Bethesda, MD 20817
                    (301) 229-0189
                    Email: nisquire@aol.com


ALSO PRESENT:       KELLI KRAEMER-SOARES, Probation Officer
                    CHRISTINE SCHUCK, Pretrial Agent

Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter
```

```
        Proceedings reported by machine shorthand, transcript
            produced by computer-aided transcription.
```

1              **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  The Court calls the

3      parties in the matter of United States of America versus

4      Anthony Vuksanaj, Criminal Case 21-620.

5              Your Honor, Probation Officer Kelli Kraemer-Soares

6      is joining us via video, and Pretrial Agent Christine Schuck

7      is joining us via telephone.

8              Counsel, please come forward and state your names

9      for the record.

10             MS. PROUT:  Good morning, Your Honor.

11     Alison Prout representing the United States.

12             THE COURT:  Yes.  Good morning, Ms. Prout.

13             MR. SILVER:  Good morning, Your Honor.

14     Nathan Silver for Mr. Anthony Vuksanaj, who is here.

15             THE COURT:  Yes.  Good morning, Mr. Silver.

16             Good morning, Mr. Vuksanaj.

17             THE DEFENDANT:  Good morning.

18             THE COURT:  Mr. Vuksanaj, are you vaccinated?

19             THE DEFENDANT:  What?

20             THE COURT:  Are you fully vaccinated?

21             THE DEFENDANT:  Yes.

22             THE COURT:  But, nonetheless, could you just put

23     your mask on.

24             THE DEFENDANT:  Sure.

25             THE COURT:  So, if you are fully vaccinated, you

1    may remove your mask when you are speaking.

2             All right.  You may be seated.

3             All right.  We're here this morning -- just so the

4    record is clear -- for the sentencing of the defendant,

5    Anthony Vuksanaj --

6             Am I pronouncing your name correctly?

7             THE DEFENDANT:  Correct.

8             THE COURT:  Okay, Vuksanaj.

9             -- who pleaded guilty to the petty offense in

10   Count 4 of the information against him for parading,

11   picketing, and demonstrating in a Capitol Building.

12            For the record, this sentencing hearing is in

13   person, but the public access line is on and is being made

14   available for people to listen to the proceedings remotely.

15            Anyone listening to the sentencing hearing over

16   the public teleconference line is reminded that, under my

17   Standing Order 20-20, recording and rebroadcasting of court

18   proceedings, including those held by videoconference, is

19   strictly prohibited.  Violation of these prohibitions may

20   result in sanctions, including removal of court-issued media

21   credentials, restricted or denial of entry to future

22   hearings, or any other sanctions deemed necessary by the

23   presiding judge.

24            All right.  I am going to begin the sentencing

25   hearing as I normally do, by reviewing all of the paperwork

1    I have received and looked at in connection with your

2    sentencing, Mr. Vuksanaj, because I like to make sure that

3    everybody is working from the same set of documents.

4        If I could ask the probation officer just to get

5    off the video screen; it's a little distracting.  Thank you.

6        Okay.  So in connection with Mr. Vuksanaj's

7    sentencing I have reviewed, of course, the probation

8    office's presentence investigation report which is docketed

9    at ECF 34; the sentencing recommendation by the probation

10    office docketed at ECF 35, and, also, documents submitted by

11    counsel in connection with the hearing.

12        The government has submitted a sentencing

13    memorandum docketed at ECF 37.  The defendant has submitted

14    a sentencing memorandum docketed at ECF 38.  The government

15    has also supplemented its memorandum in response to my

16    request for additional information, and that's docketed at

17    ECF 40.

18        I have also reviewed the 11 videos that were

19    submitted by the government in aid of sentencing that can't

20    be docketed -- they're not in a format that can actually be

21    docketed on our case management electronic filing system --

22    but I have reviewed all of those videos.  And they were

23    noticed by the government on the docket at ECF Nos. 23

24    and 36.

25        So let me just check on one thing.

1          Mr. Silver, the defendant hasn't submitted any

2     letters to the Court from friends or family or a personal

3     letter from himself; is that correct?

4          MR. SILVER:  That is correct, Your Honor.

5          But I will just add that he has a very large

6     contingent here in court this morning -- which includes his

7     wife and his daughter, many family members, cousins and

8     such -- who are here in support of him.  And I'd just like

9     the Court to note that they're all seated in the audience.

10          THE COURT:  Yes.  I do see them all.

11          I see some people are not having their mask fully

12     cover their noses and their mouths, so please keep your

13     masks up.

14          MR. SILVER:  Yes.

15          THE COURT:  Where are you from, Mr. Vuksanaj?

16          THE DEFENDANT:  New York.

17          THE COURT:  New York.  I don't know what the

18     situation is in New York, but the CDC has just increased the

19     heightened transmission rates in D.C.  A lot of us know lots

20     of people have COVID right now, so there is a reason for the

21     CDC warning.  People come to court -- here -- not just

22     voluntarily, but because they're required and summoned to

23     come; meaning, if they don't come, I send the marshals out

24     to arrest them.  So a lot of people are in court not

25     voluntarily, like you, but because they must be.  And we

 1    have an obligation to make sure we keep them as safe as

 2    possible.  So for that reason -- we don't check whether

 3    people are vaxxed, boosted, and so on.  We just require

 4    everybody to wear masks to keep everybody as safe as

 5    possible, including people who are required to be present

 6    here.

 7            All right.  So what I would like to do,

 8    Mr. Vuksanaj, after I make sure everybody is working on the

 9    same set of documents is also explain to you how this

10    sentencing hearing will proceed.  It's helpful to you --

11    it's helpful to your family and friends who are here -- to

12    know what is going to be happening during the course of this

13    hearing.

14            My sentencing hearings are divided into three

15    different steps.  And the first step is to determine whether

16    the government or you, through your counsel, have any

17    objections to any of the factual or other portions of the

18    presentence investigation report; and if there are

19    objections, I will resolve them.

20            The second step is to hear first from the

21    government, then from your counsel, then from you,

22    Mr. Vuksanaj, if you want to address me directly about an

23    appropriate sentence in your case.

24            And then the last step requires the Court, me, to

25    explain the reasons for the sentence I am about to impose,

1    and then to impose sentence.

2            I know some defendants know they have an

3    opportunity to speak to me directly, but they don't know

4    precisely when.  And I want you to be assured about when --

5    and understand, during the course of the hearing, when it is

6    I will call on you to step forward and speak to me directly

7    if you wish to do so.

8            So do you have any questions about what is going

9    to be happening during the course of this hearing?

10           You have to speak up.

11           THE DEFENDANT:  No.

12           THE COURT:  Okay.  Thank you.

13           All right.  So let's start with the first step,

14   the final presentence investigation report and sentencing

15   recommendation, both of which were filed on March 22, 2022.

16   And I understand, from the PSR, that the government has no

17   objection to any of the factual or other determinations set

18   out in the PSR.

19           MS. PROUT:  Your Honor, the government did not

20   file any objections.

21           Defense counsel did note in his memorandum one

22   error that the government concurs should be clarified in

23   paragraph 4.  The PSR states that there is a term of

24   supervised release of not more than one year.  Elsewhere in

25   the PSR, in paragraphs 66 and 68, it does correctly state

1    that there is no term of supervised release, but up to five

2    years of probation.

3            The plea agreement did correctly state that term,

4    and it was reviewed in open court; but I did want to flag

5    that for correction in the PSR, Your Honor, and that was the

6    only correction the government would note.

7            THE COURT:  Okay.  In paragraph 4.

8            And the plea agreement does not say that?

9            MS. PROUT:  Correct.  The plea agreement correctly

10   states the 5-year probationary period, and does not state

11   that there is a supervised release period.

12           THE COURT:  So precisely what you're asking me to

13   change in paragraph 4 -- because I have to rewrite this,

14   right? -- so I need specific language you want eliminated or

15   added to it?

16           MS. PROUT:  Yes, Your Honor.

17           So in line 6 of paragraph 4, a correction to the

18   statement, "A term of supervised release of not more than

19   one year," should be changed to, "A term of probation of not

20   more than five years."

21           THE COURT:  And, Mr. Silver, you agree with that

22   change?

23           MR. SILVER:  Your Honor, I think I have to because

24   I raised the objection.  Otherwise, I wouldn't have done so.

25           THE COURT:  Yes.  Well, I have to make sure the

1       record is absolutely clear.

2                  MR. SILVER:  I understand, Your Honor.

3                  I don't mean to be flip.

4                  THE COURT:  I am all about the record.

5                  MR. SILVER:  Understood, Your Honor.

6                  THE COURT:  Now, I know you have other objections

7       as well to the PSR --

8                  MR. SILVER:  Yes.

9                  THE COURT:  -- but as to the change proposed by

10      the government to paragraph 4, the defense agrees?

11                 MR. SILVER:  Defense agrees.

12                 THE COURT:  All right.  Okay.  So now let's turn

13      to the defense objections to the PSR.  And I understand you

14      have an objection to paragraph 56.

15                 MR. SILVER:  That's correct.  And, actually, I had

16      an email from Ms. Soares from the probation office this

17      morning that -- as an oversight, I guess, they neglected to

18      correct that.  I think that paragraph should probably just

19      be eliminated because it's incorrect.

20                 THE COURT:  Yes.  And the government has no

21      objection?

22                 MS. PROUT:  Correct, Your Honor.

23                 THE COURT:  Okay.  So paragraph 56 will be

24      eliminated.

25                 And there's been some back-and-forth that was

1   confusing based on the defense memo as to the PSR

2   paragraph 24, which is why I asked the government to please

3   clarify the nature of the prior conviction set out in

4   paragraph 24, which is a conviction upon verdict after jury

5   trial on May 15th, 1992, for criminal possession of a loaded

6   firearm, third degree, in Bronx County Supreme Court, Bronx,

7   New York.

8           Your sentencing memo, Mr. Silver, represents that

9   this conviction was either reversed or re-filed as a

10  misdemeanor, which was then dismissed.  And if it did result

11  in a conviction, it was a conviction not for third degree

12  possession, which is a felony, but for fourth degree

13  possession, which is a misdemeanor.

14          So I have to say based on this confusion -- and

15  it's a pretty important conviction -- I asked the government

16  to clarify what its information was.  And the government, in

17  its supplemental memo docketed at ECF 40, confirmed that the

18  information in the PSR, at paragraph 24, was correct.

19          So I wanted to find out from you whether you

20  withdraw -- although you didn't file a formal objection to

21  paragraph 24, do you withdraw whatever objection you might

22  have to paragraph 24?

23          MR. SILVER:  Yes, I do.  And I think that -- I

24  tried to couch it in a way that suggests Mr. Vuksanaj seemed

25  to think that it had been reversed and vacated, but there is

```
 1    no document or evidence of that.  And the government, I
 2    think, was able to obtain records that basically show that
 3    the conviction stands; so I will withdraw that.
 4              THE COURT:  Okay.  Good.  Thank you.  I wanted to
 5    clarify that for my criminal history review which is very
 6    important in every sentencing.
 7              Thank you, Mr. Silver.
 8              MR. SILVER:  Yes, Your Honor.
 9              THE COURT:  All right.  And you have no other
10    objections to the PSR, Mr. Silver?
11              MR. SILVER:  I do not, Your Honor.  I do not.
12              THE COURT:  And I have -- for my Rule 32 colloquy,
13    I have to make sure -- to confirm on the record -- that you
14    have reviewed the presentence investigation report with
15    Mr. Vuksanaj?
16              MR. SILVER:  Yes, I have.
17              THE COURT:  Okay.  Thank you.
18              MR. SILVER:  And provided him copies also, yes.
19              THE COURT:  Good.  Thank you.
20              Mr. Vuksanaj, could you just stand right where you
21    are.
22              Do you -- are you fully satisfied with the
23    services of Mr. Silver in your case?
24              THE DEFENDANT:  Yes.
25              THE COURT:  Do you feel that you have had plenty
```

1    of time to talk to Mr. Silver about the presentence

2    investigation report, the probation office's sentencing

3    recommendation, and the other documents filed in connection

4    with your sentencing?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Thank you.  You may be seated.

7              THE DEFENDANT:  Thank you.

8              THE COURT:  All right.  We're now at step two of

9    the sentencing hearing where I will hear from the parties.

10             I have been provided with divergent sentencing

11   recommendations in this case.  The government recommends

12   3 months' imprisonment, followed by a period of 36 months'

13   probation, compared to the probation office and the

14   defendant's recommendation for a period of probation of 36

15   months, and the probation office has also recommended 100

16   hours of community service.

17             So I will start with the government.

18             MS. PROUT:  Thank you, Your Honor.

19             Your Honor, the government's sentencing

20   recommendation in this case is based on all of the 3553(a)

21   factors, of course; but I would like to focus on four of

22   those factors for the Court today.

23             The first -- and one of the most important I would

24   ask the Court to focus on -- is the nature and the

25   circumstances of this particular offense, that is, the

1    defendant's individual role in the Capitol siege, including

2    the factors that the government and, in some past instances

3    the Court, have identified as aggravating factors.

4            As an initial matter, I would like to acknowledge

5    what type of conduct is not at issue here.  Of course, this

6    case does not involve any violence or property damage by the

7    defendant, which is why we're here on a petty misdemeanor

8    charge.  And we, likewise, found no evidence of preplanning;

9    no troubling social media posts made by the defendant; and

10   the defendant is here because he has accepted responsibility

11   by pleading guilty to this offense.  Although, I would

12   distinguish acceptance of responsibility from a showing of

13   remorse, which I will discuss in a moment.

14           In the end, although none of the factors I have

15   just listed are aggravating factors, the government does not

16   believe that anyone should get special credit, so to speak,

17   for not having those factors; but I do want to acknowledge

18   that those are not at play here.  Unfortunately, the

19   defendant's conduct does include a number of what the

20   government does consider to be aggravating factors.

21           To begin, the defendant entered the Capitol

22   Building after walking past signs of clear violence,

23   including broken glass and damaged property.  And as he

24   filmed his entry into the building, something that was

25   submitted in Government's Exhibit 8, screaming can be heard;

1    the sound of a blaring alarm can be heard as he crosses the

2    threshold.

3              In addition to the circumstances of his entry, the

4    defendant spent 40 minutes inside the building.  And

5    although he did not enter any sensitive spaces, he did cover

6    a lot of ground in the Capitol -- traveling from the first

7    floor to the second floor, and through a number of different

8    rooms within the building.

9              During the time he was inside, he walked among a

10   series of crowds making aggressive chants.  And people were

11   commenting on tear gas in the air; and some of those chants

12   even suggested that the crowd was looking for violence.

13             But perhaps most notably, the defendant was front

14   and center during two physical clashes with the police while

15   he was inside; one was in the Crypt.  And the Government's

16   Exhibit 9 is a video from the defendant's iCloud account,

17   which appears to have been taken by him.  The second clash

18   was in the Ohio Clock Corridor, and Government's Exhibit 11

19   is a video from that clash.

20             We do not have evidence that the defendant joined

21   in the physical shoving of the police, but it is very clear

22   that he witnessed it -- and not just witnessed it, but he

23   was really front and center in both of those clashes.  And

24   what the government finds significant is that he did not

25   take those opportunities to turn around and leave, and

1    particularly in the Crypt.  Because if the government's path

2    through the building is traced, he entered on the first

3    floor, through the Senate wing door, and would have gone

4    almost directly to the Crypt from there.  So he would have

5    seen that clash relatively early in his time in the

6    building, yet he walked on.

7           The details are important here because, in his

8    debrief with the government, the defendant stated that he

9    saw no violence outside, and if he had, he would not have

10   gone inside.  He also told the Court, at his plea hearing,

11   that he decided to exit when he got a call from his wife

12   that essentially put him on notice of what was going on

13   inside.

14          But the government submits that, from the videos

15   of the Crypt clash and the Ohio Corridor clash, that the

16   defendant did know that there was danger and violence

17   occurring inside, and he didn't take those opportunities to

18   exit the building.

19          As an additional aggravating factor, I want to

20   address the issue of remorse as I mentioned.  There is no

21   question that the defendant has accepted responsibility; and

22   that is to his credit, and that is why we are here following

23   a plea.

24          However, remorse, as I mentioned, I believe is a

25   little bit different, which is really the concept of:  Does

1    the defendant regret that he was there and acknowledge that,

2    the role that he played in advancing the Capitol siege?

3         At the plea hearing the defendant stated, quote:

4    There was no resistance at any point for us to get into that

5    building.  This might be technically true, but it seems to

6    ignore the resistance that he encountered along the way.

7         Importantly, at the plea hearing, the Court asked

8    the defendant about the events in the Ohio Clock Corridor,

9    and the defendant told the Court:  I was there, but I wasn't

10   part of that crowd.  And he said:  I had nothing to do with

11   the crowd.  And, to me, this reflects that the defendant

12   still perhaps does not understand the role that his mere

13   presence played that day in contributing to the

14   dangerousness and the success of the riot.

15        I would submit that the totality of this conduct

16   alone justifies a sentence of incarceration -- a short

17   incarceration sentence -- just looking at that conduct.

18        And that would be the government's recommendation

19   but for the next factor, which is the defendant's history

20   and characteristics.  And it's the combination of those two

21   that leads the government to make one of its higher

22   recommendations for incarceration.

23        THE COURT:  Yes.  I have looked at the

24   government's very helpful growing summary of all of the

25   sentences imposed on defendants arrested in connection with

1    their criminal conduct on January 6th.  And, from my review,

2    there have been only about nine defendants convicted of the

3    parading petty offense charge for whom the government has

4    recommended 3 months, or more, term of incarceration.

5         MS. PROUT:  There are a limited number, Your

6    Honor, that is correct.  And it's really, as I mentioned,

7    the combination of what he saw inside and his personal

8    characteristics.  Let me address those now.  I will address

9    some comparators in a moment as well.

10         But, as Your Honor is well aware, having looked at

11    that table, there are a fairly limited number of cases that

12    have come before this Court in which a defendant has a

13    criminal history of significance.  And, in this case, we're

14    looking at a defendant who essentially has a 30-year

15    criminal history.

16         Now, we're not talking about a terribly violent

17    criminal history, by any stretch, but a consistent criminal

18    history, and one that does include a felony conviction.

19    Eight convictions over the span of about 30 years; and there

20    are a few things notable about the lifecycle of those

21    convictions.  One is that, this is not an instance where we

22    have someone who made some regrettable decisions as a

23    youngster, and then changed his ways.

24         This is a situation where we have two convictions

25    from 2021 that were based on 2019 conduct.  They're

1    misdemeanors, but these are not just traffic offense

2    misdemeanors.  They're convictions for obstruction of

3    government administration, criminal mischief, and

4    harassment.  Again --

5              THE COURT:  Do you know anything about the

6    underlying facts of those 2019 -- 2019 offense conduct

7    resulting in the 2021 convictions?

8              MS. PROUT:  Your Honor, all I have seen is a news

9    article discussing one of them, but I don't believe that to

10   be reliable enough to really present to the Court.

11             I do know that they are from separate instances

12   based on the arrest dates and the sentencing dates.  But I

13   cannot provide the Court with more detail about that other

14   than -- as Your Honor pointed out, in one instance the

15   defendant was initially charged with felony criminal

16   mischief but, ultimately, convicted of a misdemeanor of a

17   lower offense level.

18             THE COURT:  But I am correct in terms of the

19   chronology that at the time Mr. Vuksanaj engaged in criminal

20   conduct on January 6, 2021, he was already facing charges in

21   New York State on two other instances of criminal conduct?

22             MS. PROUT:  I believe that to be the case based on

23   the arrest dates.  The only thing I am not sure of is

24   whether he was on notice of those pending charges.  It would

25   be an inference to make, but I don't want to represent for

1    certain because --

2              THE COURT:  Well, he had to have been arrested on

3    those dates --

4              MS. PROUT:  He would have been arrested, yes.  He

5    would have been arrested.

6              THE COURT:  -- so he would have had to have known.

7              MS. PROUT:  I think that's a reasonable inference,

8    Your Honor.

9              And, of course, this conduct also leads to the

10   crescendo of the defendant being found with a very serious

11   cache of firearms in his bedroom.

12             THE COURT:  I will say so.  And the government has

13   said that he was a prohibited person because of his 1992

14   felony gun offense; am I correct on that?

15             MS. PROUT:  Correct, Your Honor.  Yes.

16             I would note, in the defendant's sentencing

17   memorandum, he points out that the government has not

18   brought charges against the defendant for those offenses.

19   And all I would say to that is that, of course, the statute

20   of limitations has not run on those offenses; and I don't

21   believe that conclusions can be drawn from the status of any

22   charging or noncharging to date, Your Honor.

23             THE COURT:  Well, I mean, the government found

24   four guns in his residence; three were in his bedroom, one

25   was a loaded automatic rifle leaning against his bed frame.

1    And he had just recently been convicted of disorderly

2    conduct and violent behavior, and I have the same question

3    the defense pointed out.  If this was so serious -- and it

4    sounds pretty serious -- why hasn't he been charged with

5    being a felon in possession under 18 U.S.C. 922(g)?

6           MS. PROUT:  I acknowledge the Court's question.

7    And all I can say is that a different office is responsible

8    for those decisions, and I can't state whether a final

9    decision has been made with regard to charging, Your Honor.

10          THE COURT:  Has this office referred charges to

11    the appropriate U.S. Attorney's Office in New York?

12          MS. PROUT:  Your Honor, this office has been in

13    direct communication with that office; but to avoid

14    disclosing any confidential investigation details, I'd

15    rather not comment further.

16          THE COURT:  All right.

17          MS. PROUT:  Regardless of whether new charges have

18    issued or will issue, however, of course we're not here to

19    convict the defendant beyond a reasonable doubt of those

20    offenses; and I do believe the Court can and should consider

21    that conduct in the sentencing decision today.

22          THE COURT:  Well, that's part of the whole point --

23          MS. PROUT:  Of course.

24          THE COURT:  -- of the 3553(a) factor of looking at

25    the defendant's history and characteristics.

1          MS. PROUT:  Of course, Your Honor.

2          THE COURT:  So absolutely.

3          MS. PROUT:  And, again, what I would say here is

4   that if we were looking only at this criminal history but

5   with a defendant who had, say, entered the building for five

6   minutes, thought better of it, turned around and gone home,

7   I think the government would likely be recommending a short

8   period of incarceration.  However, it's in concert with the

9   defendant's actual conduct of that day that led the

10  government to the recommendation that it makes today.

11          Two other factors that I would highlight for the

12  Court.  The first of those two is the need for the sentence

13  to reflect the seriousness of the offense and to promote

14  respect for the law.  This is a factor in common to all of

15  these cases.  And though I know these words have been said

16  before, I do believe they can't be said enough, which is

17  that:  The attack on the United States Capitol was an attack

18  on the rule of law.  It is difficult to fathom a more

19  serious affrontation [sic] to democracy than what occurred

20  that day, and every rioter played a role in bringing those

21  acts to fruition.  It was the fear that was instilled in the

22  members of Congress and law enforcement and other innocent

23  bystanders that day, and the lasting effect on our

24  democracy -- all of those things, I believe, weigh in

25  general in favor of a sentence of incarceration, and they're

1    just as true in this case as in every other case, Your

2    Honor.

3              THE COURT:  All right.

4              MS. PROUT:  And the last factor -- sorry.

5              THE COURT:  Go ahead.  I have some questions, but

6    I want you to finish your presentation.

7              MS. PROUT:  The last factor is simply to address

8    the need to avoid unwarranted sentencing disparities.

9              It is, in some ways, getting easier and in some

10   ways getting harder as the body of cases grows.

11             THE COURT:  That's certainly the way all of us

12   feel -- sentencing judges in these cases.

13             MS. PROUT:  We obviously have a lot more data

14   points, but as I am sure Your Honor has seen, it's simply

15   impossible to find a perfect comparator.  The government has

16   identified three cases that we believe to at least be in the

17   same direction of the defendant's case; the *Stenz* case, the

18   *Camper* case and the *Pham* case.  Each of those cases were

19   identified because they involved government recommendations

20   for some period of incarceration, ultimate sentences of

21   incarceration, and in the government's view, aspects that

22   are less serious than the defendant's case here.

23             At the end of the day, of course, it's not a

24   mathematical calculation.  Some courts will weigh the

25   varying factors differently.  The government's

1    recommendation here is made in an effort to be as consistent

2    as possible, recognizing that not everybody will see these

3    factors the same way.

4         THE COURT:  And so the government has made a

5    recommendation of three months' incarceration, which would

6    require this Court to resolve the legal issue that my

7    colleagues on this court have taken divergent views of.

8    Some have said it's okay to have a split sentence for a

9    petty offense.  Others have said, no, it's not okay; a petty

10   offense is subject to the same split sentence bar that

11   Class A misdemeanors and felonies are.

12        So far, I have not had to resolve that legal issue

13   as I am monitoring very carefully the decisions being issued

14   by my very smart, thoughtful colleagues.  And if I took up

15   the government's recommendation in this case for three

16   months' incarceration, that is too long a period of time to

17   be subject to the intermittent confinement authority as a

18   special condition of probation, and I would have to resolve

19   the split sentence legal issue in this case.

20        I have had no briefing from the defense on the

21   split sentence issue.  So I will -- and I am not sure that

22   this case is -- even if it warrants a period of

23   incarceration, is sufficiently serious for me to have to

24   resolve this very significant legal issue, which the D.C.

25   Circuit, if not the Supreme Court, is ultimately going to

24

1      have to decide.  We are -- this is truly one where the

2      district court judges are the stepping stones helping to

3      inform thought on the legal issue.  But it's ultimately

4      going to have to be resolved by a Court of Appeals or, as I

5      said, the Supreme Court.

6              Let me turn to one issue that really stood out

7      with me; that is, that the PSR and the defense makes a lot

8      of arguments about how this defendant was in a car accident

9      in 2011 that resulted in such severe injuries that he has

10     been permanently disabled, and so every month he gets SSI

11     benefits paid for by the taxpayers.  And I watched him, on

12     the government's video exhibits, and I have read that he

13     drove all the way from Mahopac, New York, about a five-hour

14     drive -- drove all the way here to D.C., he went to the

15     former President's rally.  He stayed to the conclusion of

16     the last speech, standing up after a five-hour drive.  He

17     then walked from the White House area to the Capitol --

18     that's about two miles.  And then I saw him, through the

19     videos, walk all through the Capitol Building for over 40

20     minutes.  It looked like he got around very well, and he was

21     raising his arms taking videos.  He had a lot of mobility.

22             He engaged, from what I saw, at the front of the

23     line with the police officers -- with the mob, trying to

24     break the police lines where there was a lot of shoving and

25     pushing.  There was even one point where the police were

1    valiantly trying to keep the crowd out of the center of the

2    Capitol Building, and he held onto a wall so he wouldn't be

3    pushed away.  And then, after all of this excitement of

4    participating in a riot to take down our democracy, this

5    defendant got in his car and drove home for another five

6    hours.  This does not depict a man who looks disabled or

7    having any difficulty with mobility.

8         So has the government made any referral of all of

9    this evidence to the Social Security Administration so they

10    can take a look and see whether he actually qualifies as

11    permanently disabled to receive a check giving him time

12    during the day to come participate in rallies and riots at

13    the Capitol?  Have you done that?

14         MS. PROUT:  Your Honor, no.

15         THE COURT:  Why not?

16         MS. PROUT:  The government has not done that; and

17    I think that's something that is worth looking into as far

18    as the government's policy for --

19         THE COURT:  Are you precluded from your plea

20    agreement from making referrals to all appropriate agencies

21    who might be interested that we are paying somebody that is

22    permanently disabled who can engage in that kind of conduct

23    in a single day?

24         MS. PROUT:  I don't think anything in the plea

25    agreement would preclude the government, Your Honor.  And I

 1          think -- I think those are valid points.

 2                    I think Your Honor has accurately stated the

 3          record, and I think that's something for the government to

 4          look at.

 5                    THE COURT:  Are you going to do that?

 6                    MS. PROUT:  Your Honor, I can certainly take that

 7          back to supervision and find out, again, if there is any

 8          policy about how that type of referral is handled -- and I

 9          will do that.

10                    THE COURT:  All right.

11                    Now, the defendant's plea agreement, at

12          paragraph 3, requires him to have an interview with law

13          enforcement and show any social media accounts.  Has that

14          cooperation agreement been accomplished in this -- and

15          satisfied?

16                    MS. PROUT:  Yes, Your Honor.  There was a debrief

17          that took place with the FBI, and myself and the defendant.

18                    THE COURT:  Okay.  And it's based on that video

19          specifically that the government believes he doesn't -- he

20          hasn't shown any remorse?

21                    MS. PROUT:  That is correct, Your Honor.

22                    Statements made in the course of that interview

23          included statements along the effects of that the defendant

24          didn't see violence outside; and if he had, he would not

25          have entered.

1          The defendant did state that he was sorry that he

2     was there, and he wished he had not been there that day.

3     But the government's interpretation of those statements that

4     the defendant regrets that he's caught up in the legal snarl

5     that he is now -- we did not hear words indicating an

6     acknowledgment of the role that he played in contributing to

7     the terrible events of that day.

8          THE COURT:  That is something I have noticed among

9     other defendants who are like, that mob was terrible.  It's

10    like, really?  You know you were a member of that mob?  And

11    sometimes there is -- I feel like I get a moment of

12    recognition as they're standing in front of me:  Oh.  Yeah,

13    maybe I was.  Yeah, I think maybe you were.  So that's

14    not -- it doesn't -- it's not unusual, actually, in what I

15    have seen what is becoming -- but you do hope.  You do hope.

16          MS. PROUT:  You do hope.

17          THE COURT:  You do hope.

18          MS. PROUT:  I don't think it's ever too late for

19    that recognition to come, Your Honor.

20          THE COURT:  All right.  Thank you.

21          MS. PROUT:  Thank you, Your Honor.

22          THE COURT:  Mr. Silver.

23          MR. SILVER:  Thank you, Your Honor.

24    May I remove my mask, Your Honor?

25          THE COURT:  Yes, you may.  If you feel comfortable

1    doing it.  It's not a requirement.  I presume you're fully

2    vaccinated.

3               MR. SILVER:  Yes, I am.  I even got my fourth

4    shot, I think, two weeks ago.

5               Your Honor, the January 6th events, which included

6    the breach of the Capitol riots, people getting hurt,

7    terrible things happening were really unique in our history,

8    and I started thinking about that in connection with the

9    sentencing here -- and especially with respect to

10   Mr. Vuksanaj's criminal history.

11              The Court has already heard from the government.

12              The government correctly, honestly characterizes

13   Mr. Vuksanaj's conduct as not involving violence against

14   persons or property, no assaultive conduct, no thefts,

15   anything like that.  But, of course, it takes very seriously

16   what Mr. Vuksanaj did and, of course, I do too.

17              I think, though, with respect to the criminal

18   history or the criminal background of Mr. Vuksanaj, I would

19   just make these observations:  People who came here that day

20   came from very different backgrounds, and had -- at least

21   from what I can tell from my own clients -- and I have more

22   than a dozen of these cases -- different motivations.

23              Some people came here just to hear former

24   President Trump speak.  Others came here as part of "Stop

25   the Steal" protest.  Some people came here -- one comes to

1    mind as a kind of citizen journalist who wanted to cover the

2    events but had partisan leanings and became involved.

3           Others like -- some with the Proud Boys or other

4    groups -- people came here to cause trouble and make real

5    trouble and to prevent the certification of the election.

6    So I think there were different motivations.

7           The thing that is interesting about this case is

8    that Mr. Vuksanaj had what would be a lengthy criminal

9    history, including one felony that goes back to 1992; and

10   yet, in terms of his conduct within the Capitol, it was

11   certainly mild in comparison with some people who came here

12   and had no criminal records and made terrible trouble.

13          So I would just ask the Court to take into

14   account -- I guess asking for a sense of proportion about

15   Mr. Vuksanaj's criminal record when evaluating that as a

16   factor that applies to this case.

17          THE COURT:  Well, just -- I mean, as we're talking

18   about that, I have gotten many, many, tens -- I am not up to

19   100 yet, but I have a lot of these cases.

20          MR. SILVER:  Right.

21          THE COURT:  And there is a big difference between

22   people who, you know, went in sort of rotunda doors, looked

23   around for a minute, and left.  People who didn't pass

24   broken glass, didn't hear alarms, people who didn't see

25   clashes with the police, although that's really hard to -- I

1    haven't seen very many of those -- who went around different

2    entrances.  And the people who were in the Capitol less than

3    five minutes or, like, not even ten minutes who basically

4    stuck their heads in, went in, you know, maybe 50 feet,

5    turned around and left -- those are one type of petty

6    offense crowd.  I do think and agree with the government

7    that the amount of time spent inside the Capitol going to

8    multiple places inside the Capitol is an aggravating factor.

9         And this defendant was inside for over 40 minutes

10   and he went into multiple locations in the Capitol, and he

11   understood exactly what was going on because he was with

12   crowds that -- in Exhibit 2, he is with a crowd chanting,

13   "USA, USA"; and then, "Whose house?"  "Our house."  And then

14   the crowd -- angry crowd chanting, "Who do they work for?"

15   "Us."  And then chanting, "Nancy, Nancy," all the way up

16   these stairs, as if they're looking for the Speaker of the

17   House of Representatives.  And thank God the Secret Service

18   and the police had evacuated Nancy Pelosi because who knows

19   what would have happened if this angry mob shouting "Nancy"

20   had found her in the midst of tear gas because the

21   videographer, with the defendant being seen, is coughing and

22   saying:  There is so much gas it's burning my nostrils.

23   This defendant was right there.

24         So this is -- this is somebody who not only spent

25   a lot of time in multiple rooms inside the Capitol, but he

1    was with crowds -- this is even before we get to the

2    confrontations that this defendant was in a crowd with that

3    helped overwhelm the police and stop our democratic process

4    that's constitutionally mandated.

5            Exhibit 4, this is the Ohio Clock Corridor where

6    the crowd is chanting, "Whose house?"  "Our house."  "You

7    serve us."  "Fuck Nancy Pelosi."  "Fuck McConnell."  "Whose

8    country?"  "Our country."  This defendant is right there.

9    And he looks on the videos as if he's yelling along with

10   this crowd.  In addition to filming this, he films people

11   saying:  "We've got the riot shield," which they must have

12   taken from the police, as its passed forward and the crowd

13   begins to yell, "Push" as they surge forward towards the

14   officers, and the crowd chanting, "USA," and "Fuck him up."

15   "They can't hold us."  This was violence.  This defendant

16   was right there in this crowd.

17           Also in the Ohio Clock Corridor, where body-worn

18   camera footage from a police officer trying to keep the

19   crowd out -- I think they're -- given the timing, they're

20   probably still evacuating the members of Congress, the

21   staff, the Vice President of the United States, a woman

22   yells and screams at officers, "I am a fucking animal."  Who

23   says that?  And the officers are yelling, "Stand down,"

24   "Stand down," trying to control this crowd.

25           And this defendant is close to the front of that

1    line with the police officers.  And he gets close to the

2    police line and then is seen holding on to the wall

3    resisting the police officers as the police officers are

4    trying to push the crowd back.  And then the officers --

5    when their pushing isn't working, they actually deploy tear

6    gas; and that's when this defendant releases the wall,

7    releases his resistance to being pushed back by the crowd.

8    It's only with the tear gas that this defendant releases

9    himself from the wall and pushes back.

10         To say that this defendant did not engage in

11   violence that day is a little bit, to my mind, accurate --

12   technically accurate, but he was in the midst of violence

13   that day and, by his presence, was helping to create the

14   circumstances for that violence, holding on to the wall,

15   requiring tear gas before he'd leave -- I could go on.

16         I mean, these videos don't show a person who poked

17   his head in for a few minutes and then left, at all.  I have

18   seen those cases.  And there are over 50 -- between 50 and

19   100 defendants who -- for petty offenses who did just that,

20   and they got straight probation.

21         I don't view this defendant -- I am going to be

22   honest with you, Mr. Silver, you have been in front of me,

23   are highly respected counsel here -- I am going to put my

24   cards on the table.  I don't see this defendant in that

25   category.

1        MR. SILVER:  I am not going to say that he is.  I

2   would simply say that the problem with mobs is that even

3   people who don't attack police officers use violence --

4   their presence emboldens those who did, and that's the

5   problem here.

6        Mr. Vuksanaj -- when he came here to Washington

7   that day was to hear the President speak.  Mr. Vuksanaj had

8   feelings about the election.  He felt that the vote and the

9   Electoral College should be delayed until there was further

10  investigation, that was his motivation; but then he joined

11  the crowd, went to the Capitol, and went inside.

12        Even though he says that -- and he has said that

13  he had trouble trying to get out of the building.  But there

14  was a substantial period of time that he was in the building

15  and also with that crowd, and that lends support to the

16  crowd.  And even if a person doesn't say anything --

17        THE COURT:  But let me -- I'm sorry to interrupt

18  you.  Go ahead, Mr. Silver.

19        MR. SILVER:  And this is something that I have

20  thought about a great deal.  Even if a person doesn't say

21  anything or do anything, or hold a banner or a flag or any

22  kind of message, it's still demonstrating because one is

23  lending one's own physical support to the group, and that's

24  what makes these things so dangerous.

25        THE COURT:  Well, one of the things you say in

1   your sentencing memo that caught my eye, Mr. Silver -- you

2   describe the defendant's conduct as being charged with four

3   misdemeanors offenses resulting from his involvement in the

4   Capitol Hill protests of January 6, 2021.  Is this

5   defendant -- is that how he views what happened on

6   January 6th, as a Capitol Hill protest?

7        MR. SILVER:  I am not sure he how views it; that's

8   how I presented it in the memo.  I think Mr. Vuksanaj would

9   have to address himself directly to the Court on that.

10        THE COURT:  I mean -- and I know that the

11   government offered a plea in this case to a petty offense

12   called:  Parading, demonstrating, or picketing, and that has

13   been confusing to people.  It just has been confusing to

14   people who think that what happened on January 6th was a

15   protest or just a demonstration in the wrong place, inside

16   the Capitol Building; and that is not what happened on

17   January 6th.  It was not a protest.

18        It was a riot, it was an attack on our rule of

19   law.  It was a successful effort to disrupt our democratic

20   process -- and it did, because everybody had to be evacuated

21   rather than do their job of certifying the Electoral College

22   vote.  So it is concerning to me for defendants who may

23   believe that what happened on January 6th, 2021, inside our

24   Capitol Building was a protest.

25        MR. SILVER:  I'd like to add one more word to --

1          THE COURT:  And I was concerned that that's how

2     your memo started and whether that was reflective of your

3     client's views.

4          MR. SILVER:  Well, let me just add one more word

5     that I used to describe also what happened, in addition to

6     what Your Honor said.  It was really an affront -- it was a

7     terrible affront to the belief that we have in this country

8     that democratic institutions are to be preserved and valued.

9          In fact, I have often said to my wife that:

10    Political stability is probably the greatest luxury any of

11    us can have, apart from having running water, electricity,

12    and food and shelter.

13         THE COURT:  And peaceful transitions of power.

14         MR. SILVER:  Yes, yes.

15         THE COURT:  Because we are not a banana

16    republic -- we hope -- where losing parties kill people, go

17    after people, create a riot -- until January 6, 2021, that's

18    how we always viewed our democracy and cherished.  So this

19    was not a protest.  This was not a protest.

20         MR. SILVER:  I am going to mention something.

21    I read a couple of years ago -- I am not sure the Court is

22    familiar with it, it was a book by Edward Banfield, a

23    sociologist at the University of Chicago, who wrote a book

24    called *The Unheavenly City*; it was published in 1966.  It

25    was revised as *The Unheavenly City Revisited* in 1974 because

1    he got so much flack.  But he has a chapter in it called,

2    *"Rioting Mainly For Fun and Profit*," where he describes

3    evolutions -- or the evolution of a riot.  He describes how

4    you can have different motivations for a riot, different

5    reasons, and he identifies four.  It's not important right

6    now to identify them, but a political protest can be one of

7    them or righteous indignation is something that's happened,

8    some terrible event.

9         But he talks about how riots tend to attract

10   different people while they're going on, and people do

11   different things.  People who go out there peacefully might

12   be joined by others who are violent.  I see that partly in

13   this case, where some people came here and were determined

14   to be peaceful or even remained peaceful, and yet others who

15   even came here determined to be peaceful became violent.

16        One thing I want to say about Mr. Camper -- I

17   think this is a good place to say this because the

18   government had averred to his sentencing -- I was his

19   lawyer, and that was a kind of fraught case.  I will just

20   say with respect to the sentencing -- that was before

21   Judge Kotelly.  There was real concern in that case for two

22   things; one was that Mr. Camper had a GoPro device and he

23   was filming while he was in the courthouse --

24        THE COURT:  Inside the courthouse or inside the

25   Capitol?

1          MR. SILVER:  I'm sorry.  I misspoke.  I was

2     thinking of another client.  I am sorry, Your Honor.

3          THE COURT:  I know which client you are thinking

4     of, Mr. Silver.

5          MR. SILVER:  Yes, Your Honor.

6          He was filming inside the Capitol.

7          What I didn't know about GoPros was that they

8     don't have an internal hard drive that records both the

9     video and the audio; you have to put a little card in.

10          So Mr. Camper submitted to two voluntary FBI

11     interviews before he was arrested.  And the FBI asked him

12     about the GoPro and where it was, never asked him to produce

13     it.  He was kind of coy about it.  In the second interview

14     he said something like:  Well, this thing is buried so

15     deeply no one is going to find it, it's like in the

16     permafrost, that kind of thing; Mr. Camper is from Montana.

17     He never specifically obstructed justice because there was

18     never a demand for it -- never demanded to turn it over, but

19     it was a kind of uncomfortable situation for him.

20          THE COURT:  I can imagine.

21          MR. SILVER:  And, also, the government never

22     obtained a search warrant from his premises to seize it, so

23     that was an issue that did disturb both the government and

24     the Court.  And Mr. Camper received the 2-month sentence

25     that the government recommended; the probation office

1    recommended 30 days in that case.

2              There was another aspect, too.  Mr. Camper, as he

3    left the Capitol, encountered a CBS TV news reporter, and

4    spoke to that reporter; it was on the evening news that

5    night.  He was talking about how he was on the front line,

6    and:  Do you know about the insurrection act -- things like

7    that, taking back our country.

8              My observation about that was that it was a

9    good -- and he identified himself by name; he was quite

10   proud and very agitated at the time that he spoke.  But my

11   observation at the time is it was a good thing that he said

12   those things on the way out and not on the way in.  It could

13   have been much worse had he said those things and those

14   things been recorded on the way in.  So that's not this

15   case.

16             There was a 60-day request in Mr. Camper's case.

17   Mr. Camper, though, was an ex-Marine; he had some legal

18   troubles, but not much in his record.  But that was a

19   different set of circumstances.  And my --

20             THE COURT:  Just since you have Mr. Vuksanaj here

21   and his family --

22             MR. SILVER:  Yes.

23             THE COURT:  -- they may be puzzled.  This is a

24   sentencing over our guy, Mr. Vuksanaj; why are we talking

25   about these other guys?

1              Just so you understand the context that we lawyers

2        understand but you-all may not, I am required, under

3        3553(a)(6) which is a statute -- I am required to read

4        carefully, apply carefully, at every sentencing in front of

5        me -- but that provision in the statute requires that I

6        avoid unwarranted sentencing disparities among defendants

7        sentenced for the same crime with similar criminal

8        histories.  So it requires judges -- and, as a consequence,

9        the lawyers who are here to assist the judge in fashioning

10       an appropriate and just sentence -- to consider defendants

11       with similar records convicted of the same crime, and that's

12       why we're spending some time talking about other cases

13       arising out of the January 6th, 2021, events, because this

14       is required.

15             So thank you for those differentiations in the

16       *Camper* case.  But I do think that every sentencing judge is

17       looking at different factors as to what will warrant the

18       different ranges of penalties available for this petty

19       offense.  And it is certainly important to the Court to look

20       at what similarly situated defendants have received.  But

21       this defendant's criminal record does stand out with a prior

22       felony conviction for a gun offense, then being found with

23       guns in his home, engaging in criminal conduct on

24       January 6th when he was already -- and still facing charges

25       on two other separate offenses.

1          MR. SILVER:  Your Honor, I am a little puzzled on

2     that point.  I know that there was a case -- I guess facing

3     charges on the matter involving the two conditional

4     discharges, I think that must be -- those are the cases --

5          THE COURT:  The 2019 cases.

6          MR. SILVER:  Right.  That's right.  Those cases, I

7     guess, were still open, and there was a conditional

8     discharge which still is a conviction.  It's something in

9     between, but it's not a --

10          THE COURT:  It's still a conviction.

11          MR. SILVER:  It's not a dismissal.  It's not a

12     dismissal.

13          THE COURT:  No.

14          MR. SILVER:  We determined that.  That's right.

15          THE COURT:  That's a distinguishing and troubling

16     factor, because what every sentencing judge does is -- as

17     we're required to do in fashioning a sentence and looking at

18     the purposes of sentencing -- and those purposes, which I

19     will review shortly, is to deter criminal conduct.  And,

20     here, it's very important to deter people from disrupting

21     the peaceful transition of power in presidential elections

22     for our democracy and for all of us who are Americans, and,

23     also, specific deterrence to deter this defendant and

24     protect the public from future crimes by this defendant.

25          So we look at criminal history pretty carefully to

1    determine what is the risk of recidivating by this

2    defendant.  And a criminal history with eight prior

3    convictions and criminal conduct conducted while facing

4    charges on two other criminal charges, that is a big red

5    flag for the risk of recidivism and typically is addressed

6    with not just periods of supervision that are lengthy but

7    also punishment to make the point.

8              MR. SILVER:  Right.

9              THE COURT:  When I look at this criminal record

10   and I look at:  What punishment has this defendant gotten

11   before?  Has he gotten a slap on the wrist or has he gotten

12   punishment that is going to make sure he remembers this?  He

13   has gotten slaps on the wrist.

14             MR. SILVER:  One thing I do want to point out -- I

15   know that Your Honor asked Ms. Prout about the 2021

16   conditional discharges.  I think those cases did involve a

17   family member.  They did not lead to domestic violence

18   convictions.  The records are stated correctly in the

19   presentence report, but I think that they did involve a

20   family member; that's my understanding.  It was not a crime

21   against a stranger or other person.

22             THE COURT:  Can I just ask you, during the -- the

23   government has pointed out, both at the hearing and in its

24   memo -- that during his interview with the FBI, Mr. Vuksanaj

25   told law enforcement that he saw police officers outside the

1    Capitol Building but that they did not try to stop anyone

2    from entering and he didn't see any confrontations with law

3    enforcement outside, and he would not have gone inside if he

4    had.  So I wanted to talk about that point a little bit,

5    that perspective a little bit.

6            Does he believe that somehow his entry into the

7    Capitol Building on January 6th -- because the police didn't

8    shoot him to stop him from going in, or other people from

9    going in -- somehow made his entry into the Capitol Building

10   authorized by law enforcement?

11           MR. SILVER:  I am not sure that's his position.  I

12   think it may be closer to the police acquiesced in the entry

13   of him and other people; I think that would be closer to it.

14           Perhaps Your Honor can ask him directly when he

15   speaks; I know he wants to speak.  I think it's more a

16   question of acquiescing than it is being invited on one hand

17   or being opposed on the other.

18           THE COURT:  And acquiescing in the face of being

19   overwhelmed.

20           MR. SILVER:  Very well could be that, that's right.

21           THE COURT:  It's not "could be," it was.

22           MR. SILVER:  Right.  Right.

23           THE COURT:  It was.

24           MR. SILVER:  In fact, I spoke with another lawyer

25   not involved in these cases who has had some experience in

1    similar matters who said that it can be a police tactic to

2    kind of fall back and not make things worse, and that --

3              THE COURT:  To deescalate a situation --

4              MR. SILVER:  To deescalate, that's right.  That's

5    exactly right.

6              THE COURT:  -- because they ultimately had a

7    choice:  They can take out machine guns and just mow people

8    down to keep them out --

9              MR. SILVER:  Sure.

10             THE COURT:  -- because short of that, tear gas

11   wasn't working, alarms weren't working, flash-bangs weren't

12   working, their bodies weren't working, their police shields

13   were being stolen from them -- nothing was working.  So I

14   don't think most Americans would fault the police for not

15   taking out their machine guns.

16             MR. SILVER:  I think that's right.  I think that's

17   right.

18             THE COURT:  Okay.  So you also raise in your memo

19   that the defendant has a disability and has continued to

20   rely on some medication and, you say, weighs in favor of a

21   noncustodial sentence.

22             And I have to say, as I have described with the

23   government, he doesn't look permanently disabled to me; not

24   given his five-hour drive to and from home and Washington,

25   D.C.; standing and watching this rally for I don't know how

1    long; walking two miles to the Capitol; walking all the way

2    through the Capitol, up and down stairs, yelling, "Nancy,"

3    "Nancy," "Where is she?" -- with the crowd.  That's not a

4    man who looks permanently disabled.  Raising his hands --

5    you can see him in the video.  He had great mobility; raises

6    his hands over his head to film the crowd.

7            Why is he permanently disabled?

8            MR. SILVER:  It's from -- I believe it's a car

9    accident or --

10           THE COURT:  I know it's a car accident; but, I

11   mean, this is not a man who looks permanently disabled to

12   me.

13           MR. SILVER:  I am not prepared to take any

14   position on that.  I know that -- it's something that has

15   not come up --

16           THE COURT:  Well, why should I take his medical

17   condition into account at all based on what I have seen?

18           MR. SILVER:  I understand that.

19           Your Honor, I will submit with respect to the

20   observations Your Honor has made.  And if Your Honor has

21   further questions of Mr. Vuksanaj, I'd be happy for him to

22   address himself.

23           THE COURT:  All right.  Mr. Vuksanaj, this is your

24   opportunity to speak to me directly.

25           THE DEFENDANT:  I'm sorry?

1          THE COURT:  This is your opportunity to step

2     forward to the podium and speak to me directly, if you wish.

3          MR. SILVER:  Mr. Vuksanaj, would like to consult.

4          THE COURT:  Yes.

5          (Whereupon, counsel and the defendant confer.)

6          THE COURT:  Mr. Vuksanaj, you may proceed.

7          THE DEFENDANT:  Judge Lady, Your Honor, District

8     Attorney, I would like to set the record straight because I

9     didn't leave my house that January 5th night, or January

10    6th, to come to the Capitol Building and cause trouble, that

11    was not my intention.

12          My intention was to go listen to the speaker

13    speak, to go back to my car, and go home.  The President,

14    Donald Trump, said:  After this, we're going to walk

15    peaceful and protest and make our voices heard to the

16    Capitol.  When we got to the Capitol, I did not see anything

17    you described happen:  People fighting, doors broken, glass.

18          I saw broken glass, yes.  I also saw scaffolding,

19    which my little brain leads me to believe there is a

20    construction area there.  Broken glass is normal in a

21    construction site, so I went in through the door.  I didn't

22    go in through no window; I didn't break nothing.  I went

23    clearly into the door.

24          You said you saw me in front of the line; that is

25    correct.  You saw me in front of the line where the police

1    were; I did not proceed.  The rowdy crowd came and caused a

2    ruckus, and you know what happened after.

3         You also said I'm holding on to the wall; that is

4    also correct.  But if you see between me and the wall what

5    is in the middle is an officer being saved by not getting

6    crushed, thanks to me, holding on to the wall.  Look at the

7    video.  You say you see me holding on to the wall, then you

8    can clearly see an officer lady between me and the wall.  Me

9    holding the wall, trying not to get crushed.  She had

10   nowhere to go.  Look at the video; you said you saw it.

11        Me screaming "Nancy," "my house" -- none of that

12   came out of my mouth; that's me recording other people

13   screaming.  I have no control over other people.  I didn't

14   go there and cause no trouble.  I didn't hit nobody.  I

15   didn't fight nobody -- and that's the end.

16        When I got a call I wasn't supposed to be there, I

17   left.  I am not going to use ignorance as a reason to break

18   the law -- stupid to know -- but that's what happened.

19        I have -- C2 to C9 [sic], I have titanium screws

20   and plates.  You may not think I am disabled.  You may think

21   it's okay, fine.  One day.  No problem.  It is what it is.

22        I didn't do nothing -- I didn't come here to do

23   anything that day.  I was in Washington seven previous times

24   to that, and I didn't cause no problem.  March for Life,

25   Stop the Steal -- there was plenty of times I came to

1    Washington, D.C., I never caused no trouble in Washington,

2    D.C.

3           Well, with that, I'm sorry.  I would like to

4    apologize to the Court, to the people, to my family.

5           I don't know what else to say, Your Honor.

6           THE COURT:  Okay.  You can stay right where you

7    are, Mr. Vuksanaj.

8           Have you completed your statement?

9           Have you completed your statement?

10           THE DEFENDANT:  Yes.

11           THE COURT:  All right.  I am now going to explain

12    the sentence and impose sentencing.

13           So after considering the sentencing memoranda that

14    have been submitted in connection with your case, the

15    presentence investigation report, and the probation

16    department's sentencing recommendations, hearing argument, I

17    must now consider the relevant factors set out by Congress

18    in 18 U.S.C. Section 3553(a), and ensure that I impose a

19    sentence that is sufficient but not greater than necessary

20    to comply with the purposes of sentencing.

21           The purposes of sentencing are a number of

22    different things, and sometimes it bears repeating what the

23    purposes of sentencing are.

24           The purposes include:  The need for the sentence

25    imposed to reflect the seriousness of the offense -- and

1  this was a very serious offense.  It's a petty offense.  But

2  what happened on January 6th altogether, for the first time

3  in our history, was a disruption of the peaceful transition

4  of power between administrations; it's a first in our

5  history.  That's very serious.

6       Another purpose of sentencing is to promote

7  respect for the law.  And what happened on January 6th was a

8  disruption of a process required by our most fundamental law

9  in our country, which is constitutional law.

10      Our Constitution requires the Congress to meet in

11  a Joint Session of Congress to review the electoral count

12  votes, count them, and then certify the presidential

13  election.  So rather than respect that process, it was

14  disrupted by every single person who entered the building

15  unlawfully on January 6th.  They formed a crowd that

16  overwhelmed the police, forced the evacuation of the Vice

17  President of this country, all of the members of Congress

18  who were there to do their job, staff, press, and everybody

19  else in the building -- terrorized them; they hid under

20  their desks; they were evacuated.  So promoting respect for

21  the law is a very important purpose of sentencing.

22      It's also to provide just punishment for the

23  offense, deter criminal conduct -- and every sentencing

24  judge in this court facing a defendant arrested and charged

25  in connection with January 6th -- believe me -- wants to

1    make sure it doesn't happen again for the good of our

2    democracy.

3              Another purpose is to protect the public from

4    future crimes by you, Mr. Vuksanaj, and to promote

5    rehabilitation.

6              So pursuant to 18 U.S.C. Section 3553(a) I am

7    supposed to consider the nature and circumstances of the

8    offense; the history and characteristics of you,

9    Mr. Vuksanaj; the types of sentences available; the need to

10   avoid unwarranted sentence disparities among defendants

11   convicted of similar conduct with similar records, and the

12   need to provide restitution to any victims of the offense.

13             I am going to begin with the restitution amount

14   owed by this defendant.  The statute of conviction is not

15   covered by our general restitution statutes, and the Court

16   has no authority to determine any restitution amount.  I am

17   limited by what the government has agreed to with the

18   defendant in the plea agreement, which calls for a

19   restitution payment of $500 which this Court will order

20   pursuant to 18 U.S.C. Section 3663(a)(3).

21             Regarding the nature and circumstances of the

22   offense, this defendant's been convicted of parading,

23   demonstrating, or picketing in a Capitol Building in

24   violation of 40 U.S.C. 5104(e)(2)(G), which is a petty

25   offense, Class B misdemeanor.

1          And I make clear at every single one of these

2     sentencings that although this criminal statute is titled:

3     Parading, demonstrating, or picketing in a Capitol Building,

4     what happened on January 6th at the Capitol was not

5     protected First Amendment parade or demonstrating or

6     picketing or protesting.  It was a riot that overwhelmed the

7     police with people unlawfully inside the Capitol Building.

8          This defendant, by participating with that crowd,

9     following the crowd all through the Capitol, helped

10    facilitate the riot that overwhelmed law enforcement, and as

11    I've said before, disrupted the peaceful transition of power

12    and the certification of the 2020 presidential election.

13         He got here -- drove here from New York.  He

14    approached the Capitol Building after attending a rally;

15    marched with the crowd for about two miles, all the way down

16    from the Ellipse to the Capitol Building.  He filmed

17    actually -- I can see -- you went into the Capitol Building.

18    And there are people crawling through broken windows, you

19    can see in the video.  And despite witnessing mayhem while

20    outside the Capitol Building, he decided to stay inside and

21    walk his way through.

22         The defendant, as I have said, told law

23    enforcement he saw police outside the Capitol but they

24    didn't try to stop anyone from entering.  And it is very

25    important to pause to address this apparent perception that

1    the fact that the police, who are overwhelmed at the time,

2    didn't stop somebody from engaging in unlawful conduct

3    somehow makes that unlawful conduct by breaching the Capitol

4    lawful.  It does not.

5            A basic legal principle that I will repeat as

6    often as necessary is that:  The defendant's actions were

7    unlawful no matter what he perceived the police to be doing.

8            THE DEFENDANT:  Even though --

9            THE COURT:  Settled case law makes absolutely

10   clear that police inaction does not somehow make unlawful

11   conduct legal.

12           In this case, police officers chose to minimize

13   harm, tried to deescalate an incredibly chaotic and volatile

14   situation with their lives on the line because they were so

15   outnumbered; and they eventually reached a point after which

16   they could not prevent the defendant and fellow rioters from

17   advancing further into the Capitol into different areas

18   inside the building.  The best the police could do was

19   evacuate people safely.

20           Many videos have demonstrated that different

21   entryways to the Capitol were protected by, at most, two to

22   three dozen officers; and these police lines were confronted

23   by mobs of hundreds of pushing, aggressive rioters.

24           As the Second Circuit, in *Garcia v Does*, in 2015,

25   explained over five years ago, in reviewing a legal

1    challenge arising out of a demonstration with no permit in

2    support of the Occupy Wall Street movement, "It is certainly

3    true that, by removing themselves from the demonstrators'

4    path, police allowed the protesters to advance in the sense

5    that they stopped physically blocking them.  But such an

6    action does not convey, implicitly or explicitly, an

7    invitation to go ahead."

8             This defendant entered the Capitol when rioters

9    were climbing through a broken window, alarms were blaring,

10   and then was witness to two different instances of violence

11   and altercations between law enforcement while inside.  I do

12   find it very difficult to accept that any reasonably sane

13   person, seeing what the defendant saw that day -- this

14   chanting mob looking for the Speaker of the House, people

15   aggressively trying to break police lines -- could truly

16   believe he had any lawful authority to be inside this

17   Capitol Building, let alone for over 40 minutes.

18            Shortly after entering, the defendant made his way

19   into the Crypt and engaged in his first confrontation with

20   law enforcement where a line of police officers were

21   attempting to prevent rioters from advancing further into

22   the building.  But the rioters were not to be stopped;

23   chanted, "Let us through," began shoving the police and

24   engaging in physical altercations with the police.  And the

25   defendant's own filming shows him right at the front of the

1    mob as they battled the police line.

2              Outnumbered officers couldn't control the rioters,

3    and they ultimately breached.  He could have turned back

4    then, but he didn't.  He chose to travel deeper into the

5    building with the rioters, instead of looking for a way out.

6    And he continued to roam the hallways on the first floor and

7    joined the mob -- climbing the set of stairs heading not

8    out, but deeper into the building; climbing the stairs

9    heading past Speaker Pelosi's office, chanting "Nancy,

10   Nancy," looking and sounding and taunting like a lynching

11   mob for the Speaker of the House of Representatives.  Again,

12   thankfully, due to the fact that Speaker Pelosi had been

13   evacuated, the mob did not find her.

14             Once upstairs, the defendant didn't look for a way

15   out.  He wandered deeper into the Capitol Building,

16   following rioters down a hallway as they chanted, "Whose

17   house?"  "Our house."  Some of them were punching and

18   kicking in doors.

19             Then, at around 2:40, he engaged in a second

20   confrontation with officers in the Ohio Clock Corridor and

21   joined a mob, as a line of officers were trying to prevent

22   them from going any further into the building, and the mob

23   was chanting at the officers, "You serve us."

24             At one point, the defendant waves his hand forward

25   as if directing others to push forward toward the police,

1    and he makes his way to the front of the mob.  This is when

2    someone in the crowd yells, "We've got the riot shield," and

3    the shield makes its way forward; and the mob begins to yell

4    "Push," and surges towards the police line.  The defendant

5    is right there, at the front of this mob.

6          Reinforcements finally arrive; and body-cam

7    footage from police officers shows the defendant resisting

8    the officers attempting to push him and the crowd back; and

9    then the officers have to deploy chemical spray, and then,

10   only then, does the crowd step back.  Then the defendant

11   made his way to the Rotunda, and exited the Capitol at

12   about 3 p.m.

13          In total, he spent about 40 minutes inside the

14   Capitol.  And from start to finish, it shows that the

15   defendant went deeper and deeper into the Capitol even while

16   seeing confrontations with police officers.

17          The nature and circumstances of this offense show

18   the need for the sentence to reflect the seriousness of it,

19   to promote respect for the law; and it generally favors a

20   custodial sentence.

21          Other aspects of the defendant's offense conduct

22   are far more troubling than other defendants facing this

23   petty offense charge.  First, he spent 40 minutes inside the

24   building, rather than less than 5, less than 8 minutes, as

25   other petty offense offenders.  He spent 40 minutes, and

1      chose not to leave earlier despite witnessing and being part

2      of two confrontations between the police and other rioters.

3              Second, he placed himself at the front lines of

4      two separate mobs attempting to overcome the outnumbered

5      police and push through deeper into the Capitol Building.

6      And in fact, during the first confrontation, the rioters

7      succeeded; breached the police line in the Crypt allowing

8      the mob to pour through into other areas of the Capitol.

9              And, third, the defendant engaged in this unlawful

10     conduct on January 6, 2021, while facing state charges in

11     New York for conduct stemming from two separate arrests

12     taking place in June 2019 and July 2019.  These aggravating

13     factors distinguish defendant's conduct as more serious than

14     that of other defendants convicted of a petty offense due to

15     their criminal actions on January 6th.

16             Regarding this defendant's history and

17     characteristics, he does have eight prior convictions

18     extending for almost three decades beginning in 1992, when

19     he was 21, until his most recent convictions right after the

20     riot in April 2021.

21             The last two convictions occurred just weeks after

22     his participation in the Capitol riot and were for

23     misdemeanor charges in New York of criminal mischief and

24     harassment, as well as for obstructing governmental

25     administration and disorderly conduct, fighting and violent

1    behavior.  And his conduct on January 6th took place while

2    he was awaiting judgment on these charges, as I have already

3    mentioned.

4         In most of his prior convictions, the defendant

5    has only received probation sentences or fines; and all of

6    these interactions with the criminal justice system did not

7    make him pause before participating in the Capitol attack

8    perhaps because the probation periods previously imposed did

9    not make enough of an impression.

10        Additionally, despite being prohibited from

11   possessing firearms due to his felony conviction, when the

12   defendant was arrested in this instant offense, he was found

13   in his bedroom with four firearms, one of which was loaded,

14   an automatic rifle leaning against his bed frame.

15        The defendant is married, has been in a stable

16   relationship since 1997.  He has children, one of whom --

17   one of his two children still resides with him.  He has

18   completed 10th grade.  He was steadily employed for 27 years

19   until a car crash in 2011 left him disabled, and he received

20   monthly SSI benefits due to his disability.

21        The defense has argued, in its sentencing memo,

22   that because of his disability a period of incarceration

23   would somehow be not appropriate in this case.

24        And I take medical issues fairly seriously; but

25   from what I have seen of the defendant's conduct on

1    January 6th, being able to drive five hours early in the

2    morning on January 6th to D.C., attend a rally, walk two

3    miles to the Capitol; inside the Capitol, walking around for

4    about 40 minutes while raising his arms to take a video;

5    engaging in being part of the crowd that engaged in two

6    physical confrontations with the police officers, then

7    driving home -- he was clearly mobile, engaged in this

8    conduct on January 6 -- was not slowed down at all by a

9    disability.

10          And his multiple convictions and arrests, after

11   2011 [sic], show his disability certainly hasn't deterred

12   him from engaging in criminal conduct.

13          Now, the need for the sentence imposed to deter

14   criminal behavior and protect the public from future crimes

15   by the defendant are critical considerations for every

16   sentencing judge and it highlights that, in this case, there

17   is a need for deterrence in the form of a sufficient

18   sentence to deter this defendant and others from engaging in

19   similar conduct.

20          Dissatisfaction with our country's legitimate and

21   peaceful avenues for expression of discontent does not give

22   any citizen license to disobey the law or to try and

23   overthrow a democratically elected government.

24          THE DEFENDANT:  No one was trying to do that, Your

25   Honor, to overthrow --

1          THE COURT:  I have seen the videos, Mr. Vuksanaj,

2    and heard what the crowd is shouting.

3          THE DEFENDANT:  You saw videos, that's -- you talk

4    about "peaceful transition," peaceful -- there was none.  We

5    didn't -- I didn't do none of that, what you are saying that

6    I wanted to go and disrupt all of this.  There was none of

7    that happening.

8          THE COURT:  You are not helping.  You are not

9    helping yourself, Mr. Vuksanaj.

10          THE DEFENDANT:  The police let us in.  They let us

11    in.

12          How we get in trouble and the police let you in?

13    I don't get it.

14          THE COURT:  The importance of deterring people

15    from engaging --

16          THE DEFENDANT:  By the time I got there, there was

17    no overthrowing the police.

18          THE COURT:  -- in interrupting the peaceful

19    transition of power weighs heavily in this Court's

20    consideration, particularly from what I am seeing here at

21    this sentencing hearing.

22          Regarding the types of sentences available, this

23    defendant was convicted of a Class B misdemeanor and --

24    which is subject to a maximum term of imprisonment of

25    6 months, and up to 5 years' probation.  And the government

1    argues that a split sentence of both 36 months of probation

2    and a 3-month term of imprisonment is appropriate.

3            Defense counsel hasn't argued about whether a

4    split sentence may be imposed here, and doesn't address the

5    propriety of a split sentence in submissions to the Court.

6            Ultimately, I am going to decide that it is

7    unnecessary, although tempting, to decide the permissibility

8    of a split sentence in this case.  Although, I do think a

9    period of incarceration is appropriate, I am going to do it

10   as intermittent confinement without deciding on the split

11   sentence.

12           Being convicted of a Class B misdemeanor also

13   subjects the defendant to a maximum fine of $5,000.  And the

14   probation officer, based on financial information provided

15   by the defendant, indicated that the defendant does not

16   appear to have the ability to pay a fine in addition to the

17   restitution amount, but I disagree with that finding.

18           For the past three years the defendant and his

19   wife's joint income tax returns show an average income of

20   approximately $45,000, and total income of over $50,000 for

21   two out of those three years.  And so as a consequence --

22   and I also look and have seen that he has paid fines for

23   criminal convictions before, a thousand-dollar fine issued

24   in 2009 for a DUI conviction; and yet he has not been

25   deterred from engaging in criminal conduct.  So I do find

1        that imposition of a more substantial fine is appropriate in

2        this case.

3               Regarding the need to avoid unwarranted sentencing

4        disparities, the defendant requests only a probation period.

5        A range of sentences have been imposed, both probationary

6        and custodial, of January 6th defendants.

7               Given the specific offense conduct of

8        Mr. Vuksanaj, along with his criminal history and his

9        statements at this hearing today where he is not -- which do

10       not reflect an understanding of the seriousness of the

11       offense conduct, I do believe that a lengthy period of

12       probation will be appropriate to ensure he is subject to

13       supervision and does not engage again in political violence,

14       like that that occurred on January 6th.

15              And due to the aggravating factors already noted,

16       specifically:  His decision to remain in the Capitol for 40

17       minutes; his presence at the front of the mob for two

18       confrontations with police attempting to prevent rioters

19       from moving deeper into the Capitol; his criminal history,

20       including his recent unlawful possession of several firearms

21       when he -- due to his prior felony conviction, was

22       prohibited from possessing firearms; his decision to engage

23       in criminal conduct on January 6th, while awaiting judgment

24       on state criminal charges pending in New York, his term of

25       probation will include a special condition of intermittent

1      periods of confinement.

2              So based on my consideration of these and other

3      factors, I will now state the sentence to be imposed.

4              Pursuant to the Sentencing Reform Act of 1984 and

5      in consideration of the provisions of 18 U.S.C. Section

6      3553, it is the judgment of the Court that you, Anthony

7      Vuksanaj, are hereby sentenced to a term of 36 months, which

8      is 3 years, of probation on Count 4 of the information; with

9      special conditions of a total of 42 days of intermittent

10     confinement, to be served in three different increments of

11     14 days each, and 3 months of home detention.

12             In addition, you are ordered to pay a special

13     assessment of $10, in accordance with 18 U.S.C.

14     Section 3013, and a criminal fine of $2,000.

15             While on supervision you shall abide by the

16     following mandatory conditions, as well as the standard

17     conditions of supervision, which are imposed to establish

18     the basic expectations for your conduct while on

19     supervision.

20             The mandatory conditions include:

21             One, you must not commit another federal, state,

22     or local crime;

23             Two, you must not unlawfully possess a controlled

24     substance, which includes marijuana.  No matter what your

25     state or local rules are regarding marijuana, marijuana is a

1    federally controlled substance.  You must refrain from any

2    unlawful use of a controlled substance.  You must submit to

3    one drug test within 15 days of placement on supervision,

4    and at least two periodic drug tests thereafter, as

5    determined by the Court.

6            You must make restitution in accordance with your

7    plea agreement.  You are ordered to make restitution to the

8    Architect of the Capitol in the amount of $500.  The Court

9    determined you do not have the ability to pay interest and,

10   therefore, waives any interest or penalties that may accrue

11   on the balance.

12           You are ordered to pay a criminal fine in the

13   amount of $2,000.  The Court determined you do not have the

14   ability to pay interest and, therefore, waives any interest

15   or penalties that may accrue on the balance.

16           You shall also comply with the following special

17   conditions:  Intermittent confinement pursuant to 18 U.S.C.

18   Section 3563(b)(10).  You must serve a total of 42 days of

19   intermittent confinement.  The intermittent confinement

20   shall be served in three periods of 14 days each within your

21   first year of probation at a facility designated by the

22   Bureau of Prisons.  You must follow the rules and

23   regulations of the facility in which you are designated.

24           You must submit to home detention for a period of

25   three months as soon as practicable, and comply with the

1   location monitoring program requirement as directed by the

2   U.S. Probation Office.  You will be restricted to your

3   residence at all times, except for employment; education;

4   religious services; medical; substance abuse, and mental

5   health treatment; court-ordered obligations; and any other

6   such time specifically authorized by the U.S. Probation

7   Office.  The location monitoring technology is at the

8   discretion of the probation office.  The costs of location

9   monitoring are waived.

10          You must pay the financial penalty in accordance

11  with the schedule of payment sheets of the judgment.  You

12  must also notify the Court of any changes in economic

13  circumstances that might affect the ability to pay this

14  financial penalty.

15          Having assessed the defendant's ability to pay,

16  the payment of the total criminal monetary penalties is due

17  as follows:  Payment in equal monthly installments of $100

18  to commence 30 days after the date of this judgment.

19          You must provide the probation officer access to

20  any requested financial information, and authorize the

21  release of any financial information.  The probation office

22  may share financial information with the U.S. Attorney's

23  Office.  You must not incur new credit charges or open

24  additional lines of credit without the approval of the

25  probation officer.

1          Restitution payments shall be made to:  The Clerk

2     of the Court for the U.S. District Court, District of

3     Columbia, for disbursement to the following victim:

4     Architect of the Capitol, Office of the Chief Financial

5     Officer, Attention:  Kathy Sherrill, CPA, Ford House Office

6     Building, Room H2-205B, Washington, D.C.  20515, in the

7     amount of the loss of $500.

8          The financial obligations are immediately payable

9     to:  The Clerk of the Court for the U.S. District Court, 333

10    Constitution Avenue Northwest, Washington, D.C. 20001.

11    Within 30 days of any change of address, you shall notify

12    the Clerk of the Court of the change until such time as the

13    financial obligation is paid in full.

14         The probation office shall release the presentence

15    investigation report to all appropriate agencies, which

16    includes the U.S. Probation Office in the approved district

17    of residence in order to execute the sentence of the Court.

18         Pursuant to 18 U.S.C. Section 3742, you have a

19    right to appeal the sentence imposed by the Court if the

20    period of imprisonment is longer than the statutory maximum.

21    If you choose to appeal, you must file any appeal within 14

22    days after the Court enters judgment.

23         As defined in 28 U.S.C. Section 2255, you also

24    have the right to challenge the conviction entered or

25    sentence imposed if new and currently unavailable

 1    information becomes available to you, or on a claim you

 2    received ineffective assistance of counsel in entering a

 3    plea of guilty to the offense of conviction or in connection

 4    with sentencing.  If you are unable to afford the cost of an

 5    appeal, you may request permission from the Court to file an

 6    appeal without cost to you.

 7            Are there any objections to the sentence imposed

 8    not already noted on the record from the government?

 9            MS. PROUT:  No, Your Honor.

10            THE COURT:  And from the defense?

11            MR. SILVER:  No, Your Honor.

12            THE COURT:  You may be seated.

13            Does the government have a motion to dismiss any

14    open counts?

15            MS. PROUT:  Yes, Your Honor.

16            The government does move to dismiss Counts 1

17    through 3 of the information.

18            THE COURT:  That motion is granted.

19            Anything else to address today from the

20    government?

21            MS. PROUT:  No, Your Honor.

22            THE COURT:  Mr. Silver?

23            MR. SILVER:  Just one question.

24            In effect, Mr. Vuksanaj will report to a facility

25    once he is notified by probation?

1          THE COURT:  Yes.  My intention -- which is why I

2     required the location monitoring as soon as practicable --

3     is that he will begin that as soon as practicable, as soon

4     as they can get the ankle monitor on him.  And that will --

5     it will take probably about the same amount of time that

6     he's on home detention for the Bureau of Prisons to

7     designate a facility.

8          MR. SILVER:  And, Your Honor, will this be

9     transferred -- will the probation be transferred to be

10    administered by --

11         THE COURT:  I am not transferring jurisdiction of

12    any of these cases.  So if Mr. Vuksanaj violates any term of

13    his supervision, he will appear again in front of me, here

14    in court, in Washington, D.C.

15         MR. SILVER:  I understand that.  But my only

16    question is whether or not he will be supervised by the

17    probation office up there.

18         THE COURT:  Our probation office will coordinate

19    with the probation office in his location but, ultimately,

20    the supervision will be coordinated between those two

21    offices.

22         MR. SILVER:  That's fine.  Thank you for

23    explaining that.  Thank you.

24         THE COURT:  You are all excused.

25              (Whereupon, the proceeding concludes, 11:17 a.m.)

1                            **<u>CERTIFICATE</u>**

2

3          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings to the best of my

7    ability.

8          This certified transcript shall be considered null

9    and void if the transcript is disassembled and/or

10   photocopied in any manner by any party without authorization

11   of the signatory below.

12
         Dated this 16th day of June, 2022
13
         /s/ Elizabeth Saint-Loth, RPR, FCRR
14       Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

# $

**$10** [1] - 61:13
**$100** [1] - 63:17
**$2,000** [2] - 61:14, 62:13
**$45,000** [1] - 59:20
**$5,000** [1] - 59:13
**$50,000** [1] - 59:20
**$500** [3] - 49:19, 62:8, 64:7

# /

**/s** [1] - 67:13

# 1

**1** [1] - 65:16
**100** [3] - 12:15, 29:19, 32:19
**10th** [1] - 56:18
**11** [2] - 4:18, 14:18
**11:17** [1] - 66:25
**14** [3] - 61:11, 62:20, 64:21
**15** [1] - 62:3
**15th** [1] - 10:5
**16th** [1] - 67:12
**18** [8] - 20:5, 47:18, 49:6, 49:20, 61:5, 61:13, 62:17, 64:18
**1966** [1] - 35:24
**1974** [1] - 35:25
**1984** [1] - 61:4
**1992** [4] - 10:5, 19:13, 29:9, 55:18
**1997** [1] - 56:16

# 2

**2** [1] - 30:12
**2-month** [1] - 37:24
**20-20** [1] - 3:17
**20001** [1] - 64:10
**2009** [1] - 59:24
**2011** [3] - 24:9, 56:19, 57:11
**2015** [1] - 51:24
**2019** [6] - 17:25, 18:6, 40:5, 55:12
**2020** [1] - 50:12
**2021** [10] - 17:25, 18:7, 18:20, 34:4, 34:23, 35:17, 39:13, 41:15, 55:10, 55:20
**2022** [3] - 1:5, 7:15,

67:12
**20515** [1] - 64:6
**20817** [1] - 1:18
**21** [1] - 55:19
**21-620** [2] - 1:4, 2:4
**22** [1] - 7:15
**2255** [1] - 64:23
**229-0189** [1] - 1:18
**23** [1] - 4:23
**24** [5] - 10:2, 10:4, 10:18, 10:21, 10:22
**27** [1] - 56:18
**28** [1] - 64:23
**29** [1] - 1:5
**2:40** [1] - 53:19

# 3

**3** [7] - 12:12, 17:4, 26:12, 54:12, 61:8, 61:11, 65:17
**3-month** [1] - 59:2
**30** [4] - 17:19, 38:1, 63:18, 64:11
**30-year** [1] - 17:14
**301** [1] - 1:18
**3013** [1] - 61:14
**30303** [1] - 1:14
**32** [1] - 11:12
**333** [1] - 64:9
**34** [1] - 4:9
**35** [1] - 4:10
**3553** [1] - 61:6
**3553(a** [4] - 12:20, 20:24, 47:18, 49:6
**3553(a)(6** [1] - 39:3
**3563(b)(10)** [1] - 62:18
**36** [5] - 4:24, 12:12, 12:14, 59:1, 61:7
**3663(a)(3)** [1] - 49:20
**37** [1] - 4:13
**3742** [1] - 64:18
**38** [1] - 4:14

# 4

**4** [8] - 3:10, 7:23, 8:7, 8:13, 8:17, 9:10, 31:5, 61:8
**40** [12] - 4:17, 10:17, 14:4, 24:19, 30:9, 49:24, 52:17, 54:13, 54:23, 54:25, 57:4, 60:16
**404** [1] - 1:15
**42** [2] - 61:9, 62:18

# 5

**5** [2] - 54:24, 58:25
**5-year** [1] - 8:10
**50** [3] - 30:4, 32:18
**5104(e)(2)(G** [1] - 49:24
**56** [2] - 9:14, 9:23
**581-6105** [1] - 1:15
**5th** [1] - 45:9

# 6

**6** [7] - 8:17, 18:20, 34:4, 35:17, 55:10, 57:8, 58:25
**60-day** [1] - 38:16
**6300** [1] - 1:17
**66** [1] - 7:25
**68** [1] - 7:25
**6th** [22] - 17:1, 28:5, 34:6, 34:14, 34:17, 34:23, 39:13, 39:24, 42:7, 45:10, 48:2, 48:7, 48:15, 48:25, 50:4, 55:15, 56:1, 57:1, 57:2, 60:6, 60:14, 60:23

# 7

**75** [1] - 1:14

# 8

**8** [2] - 13:25, 54:24

# 9

**9** [1] - 14:16
**922(g** [1] - 20:5
**9:41** [1] - 1:6

# A

**a.m** [2] - 1:6, 66:25
**abide** [1] - 61:15
**ability** [6] - 59:16, 62:9, 62:14, 63:13, 63:15, 67:7
**able** [2] - 11:2, 57:1
**absolutely** [3] - 9:1, 21:2, 51:9
**abuse** [1] - 63:4
**accept** [1] - 52:12
**acceptance** [1] - 13:12

**accepted** [2] - 13:10, 15:21
**access** [2] - 3:13, 63:19
**accident** [3] - 24:8, 44:9, 44:10
**accomplished** [1] - 26:14
**accordance** [3] - 61:13, 62:6, 63:10
**account** [3] - 14:16, 29:14, 44:17
**accounts** [1] - 26:13
**accrue** [2] - 62:10, 62:15
**accurate** [3] - 32:11, 32:12, 67:4
**accurately** [1] - 26:2
**acknowledge** [4] - 13:4, 13:17, 16:1, 20:6
**acknowledgment** [1] - 27:6
**acquiesced** [1] - 42:12
**acquiescing** [2] - 42:16, 42:18
**Act** [1] - 61:4
**act** [1] - 38:6
**action** [1] - 52:6
**Action** [1] - 1:3
**actions** [2] - 51:6, 55:15
**acts** [1] - 21:21
**actual** [1] - 21:9
**add** [3] - 5:5, 34:25, 35:4
**added** [1] - 8:15
**addition** [5] - 14:3, 31:10, 35:5, 59:16, 61:12
**additional** [3] - 4:16, 15:19, 63:24
**additionally** [1] - 56:10
**address** [11] - 6:22, 15:20, 17:8, 22:7, 34:9, 44:22, 50:25, 59:4, 64:11, 65:19
**addressed** [1] - 41:5
**administered** [1] - 66:10
**administration** [2] - 18:3, 55:25
**Administration** [1] - 25:9
**administrations** [1] - 48:4
**advance** [1] - 52:4
**advancing** [2] - 16:2, 51:17, 52:21

**affect** [1] - 63:13
**afford** [1] - 65:4
**affront** [2] - 35:6, 35:7
**affrontation** [1] - 21:19
**agencies** [2] - 25:20, 64:15
**Agent** [2] - 1:21, 2:6
**aggravating** [7] - 13:3, 13:15, 13:20, 15:19, 30:8, 55:12, 60:15
**aggressive** [2] - 14:10, 51:23
**aggressively** [1] - 52:15
**agitated** [1] - 38:10
**ago** [3] - 28:4, 35:21, 51:25
**agree** [2] - 8:21, 30:6
**agreed** [1] - 49:17
**agreement** [9] - 8:3, 8:8, 8:9, 25:20, 25:25, 26:11, 26:14, 49:18, 62:7
**agrees** [2] - 9:10, 9:11
**ahead** [3] - 22:5, 33:18, 52:7
**aid** [1] - 4:19
**aided** [1] - 1:24
**air** [1] - 14:11
**alarm** [1] - 14:1
**alarms** [3] - 29:24, 43:11, 52:9
**ALISON** [1] - 1:12
**Alison** [1] - 2:11
**alison.prout@usdoj.gov** [1] - 1:15
**allowed** [1] - 52:4
**allowing** [1] - 55:7
**almost** [2] - 15:4, 55:18
**alone** [2] - 16:16, 52:17
**ALSO** [1] - 1:20
**altercations** [2] - 52:11, 52:24
**altogether** [1] - 48:2
**Amendment** [1] - 50:5
**AMERICA** [1] - 1:3
**America** [1] - 2:3
**Americans** [2] - 40:22, 43:14
**amount** [8] - 30:7, 49:13, 49:16, 59:17, 62:8, 62:13, 64:7, 66:5
**angry** [2] - 30:14, 30:19
**animal** [1] - 31:22
**ankle** [1] - 66:4

**ANTHONY**[1] - 1:5
**Anthony**[4] - 2:4,
2:14, 3:5, 61:6
**apart**[1] - 35:11
**apologize**[1] - 47:4
**apparent**[1] - 50:25
**appeal**[2] - 64:19,
64:21, 65:5, 65:6
**Appeals**[1] - 24:4
**appear**[2] - 59:16,
66:13
**APPEARANCES**[1] -
1:11
**applies**[1] - 29:16
**apply**[1] - 39:4
**approached**[1] -
50:14
**appropriate**[10] -
6:23, 20:11, 25:20,
39:10, 56:23, 59:2,
59:9, 60:1, 60:12,
64:15
**approval**[1] - 63:24
**approved**[1] - 64:16
**April**[2] - 1:5, 55:20
**Architect**[2] - 62:8,
64:4
**area**[2] - 24:17, 45:20
**areas**[2] - 51:17, 55:8
**argued**[2] - 56:21,
59:3
**argues**[1] - 59:1
**argument**[1] - 47:16
**arguments**[1] - 24:8
**arising**[2] - 39:13,
52:1
**arms**[2] - 24:21, 57:4
**arrest**[3] - 5:24,
18:12, 18:23
**arrested**[7] - 16:25,
19:2, 19:4, 19:5,
37:11, 48:24, 56:12
**arrests**[2] - 55:11,
57:10
**arrive**[1] - 54:6
**article**[1] - 18:9
**aspect**[1] - 38:2
**aspects**[2] - 22:21,
54:21
**assaultive**[1] - 28:14
**assessed**[1] - 63:15
**assessment**[1] -
61:13
**assist**[1] - 39:9
**assistance**[1] - 65:2
**assured**[1] - 7:4
**Atlanta**[1] - 1:14
**attack**[5] - 21:17,
33:3, 34:18, 56:7

**attempting**[4] - 52:21,
54:8, 55:4, 60:18
**attend**[1] - 57:2
**attending**[1] - 50:14
**Attention**[1] - 64:5
**Attorney**[1] - 45:8
**Attorney's**[2] - 20:11,
63:22
**attract**[1] - 36:9
**audience**[1] - 5:9
**audio**[1] - 37:9
**authority**[3] - 23:17,
49:16, 52:16
**authorization**[1] -
67:10
**authorize**[1] - 63:20
**authorized**[2] - 42:10,
63:6
**automatic**[2] - 19:25,
56:14
**available**[5] - 3:14,
39:18, 49:9, 58:22,
65:1
**Avenue**[1] - 64:10
**avenues**[1] - 57:21
**average**[1] - 59:19
**averred**[1] - 36:18
**avoid**[5] - 20:13, 22:8,
39:6, 49:10, 60:3
**awaiting**[2] - 56:2,
60:23
**aware**[1] - 17:10

**B**

**back-and-forth**[1] -
9:25
**background**[1] -
28:18
**backgrounds**[1] -
28:20
**balance**[2] - 62:11,
62:15
**banana**[1] - 35:15
**Banfield**[1] - 35:22
**bangs**[1] - 43:11
**banner**[1] - 33:21
**bar**[1] - 23:10
**based**[10] - 10:1,
10:14, 12:20, 17:25,
18:12, 18:22, 26:18,
44:17, 59:14, 61:2
**basic**[2] - 51:5, 61:18
**battled**[1] - 53:1
**bears**[1] - 47:22
**became**[2] - 29:2,
36:15
**becomes**[1] - 65:1
**becoming**[1] - 27:15

**bed**[2] - 19:25, 56:14
**bedroom**[3] - 19:11,
19:24, 56:13
**BEFORE**[1] - 1:9
**began**[1] - 52:23
**begin**[4] - 3:24,
13:21, 49:13, 66:3
**beginning**[1] - 55:18
**begins**[2] - 31:13,
54:3
**behavior**[3] - 20:2,
56:1, 57:14
**belief**[1] - 35:7
**believes**[1] - 26:19
**below**[1] - 67:11
**benefits**[2] - 24:11,
56:20
**BERYL**[1] - 1:9
**best**[2] - 51:18, 67:6
**Bethesda**[1] - 1:18
**better**[1] - 21:6
**between**[9] - 29:21,
32:18, 40:9, 46:4,
46:8, 48:4, 52:11,
55:2, 66:20
**beyond**[1] - 20:19
**big**[2] - 29:21, 41:4
**bit**[4] - 15:25, 32:11,
42:4, 42:5
**blaring**[2] - 14:1, 52:9
**blocking**[1] - 52:5
**bodies**[1] - 43:12
**body**[3] - 22:10,
31:17, 54:6
**body-cam**[1] - 54:6
**body-worn**[1] - 31:17
**book**[2] - 35:22, 35:23
**boosted**[1] - 6:3
**Boys**[1] - 29:3
**brain**[1] - 45:19
**breach**[1] - 28:6
**breached**[2] - 53:3,
55:7
**breaching**[1] - 51:3
**break**[4] - 24:24,
45:22, 46:17, 52:15
**briefing**[1] - 23:20
**bringing**[1] - 21:20
**broken**[7] - 13:23,
29:24, 45:17, 45:18,
45:20, 50:18, 52:9
**Bronx**[2] - 10:6
**brought**[1] - 19:18
**Building**[22] - 1:13,
3:11, 13:22, 24:19,
25:2, 34:16, 34:24,
42:1, 42:7, 42:9,
45:10, 49:23, 50:3,
50:7, 50:14, 50:16,
50:17, 50:20, 52:17,

53:15, 55:5, 64:6
**building**[18] - 13:24,
14:4, 14:8, 15:2,
15:6, 15:18, 16:5,
21:5, 33:13, 33:14,
48:14, 48:19, 51:18,
52:22, 53:5, 53:8,
53:22, 54:24
**Bureau**[2] - 62:22,
66:6
**buried**[1] - 37:14
**burning**[1] - 30:22
**bystanders**[1] - 21:23

**C**

**C2**[1] - 46:19
**C9**[1] - 46:19
**cache**[1] - 19:11
**calculation**[1] - 22:24
**cam**[1] - 54:6
**camera**[1] - 31:18
**camper**[2] - 38:2,
38:17
**Camper**[7] - 22:18,
36:16, 36:22, 37:10,
37:16, 37:24, 39:16
**Camper's**[1] - 38:16
**cannot**[1] - 18:13
**Capitol**[62] - 3:11,
13:1, 13:21, 14:6,
16:2, 21:17, 24:17,
24:19, 25:2, 25:13,
28:6, 29:10, 30:2,
30:7, 30:8, 30:10,
30:25, 33:11, 34:4,
34:6, 34:16, 34:24,
36:25, 37:6, 38:3,
42:1, 42:7, 42:9,
44:1, 44:2, 45:10,
45:16, 49:23, 50:3,
50:4, 50:7, 50:9,
50:14, 50:16, 50:17,
50:20, 50:23, 51:3,
51:17, 51:21, 52:8,
52:17, 53:15, 54:11,
54:14, 54:15, 55:5,
55:8, 55:22, 56:7,
57:3, 60:16, 60:19,
62:8, 64:4
**car**[6] - 24:8, 25:5,
44:8, 44:10, 45:13,
56:19
**card**[1] - 37:9
**cards**[1] - 32:24
**carefully**[4] - 23:13,
39:4, 40:25
**Case**[1] - 2:4
**case**[36] - 4:21, 6:23,

11:23, 12:11, 12:20,
13:6, 17:13, 18:22,
22:1, 22:17, 22:18,
22:22, 23:15, 23:19,
23:22, 29:7, 29:16,
34:11, 36:13, 36:19,
36:21, 38:1, 38:15,
38:16, 39:16, 40:2,
47:14, 51:9, 51:12,
56:23, 57:16, 59:8,
60:2
**cases**[16] - 17:11,
21:15, 22:10, 22:12,
22:16, 22:18, 28:22,
29:19, 32:18, 39:12,
40:4, 40:5, 40:6,
41:16, 42:25, 66:12
**category**[1] - 32:25
**caught**[2] - 27:4, 34:1
**caused**[2] - 46:1, 47:1
**CBS**[1] - 38:3
**CDC**[2] - 5:18, 5:21
**center**[3] - 14:14,
14:23, 25:1
**certain**[1] - 19:1
**certainly**[6] - 22:11,
26:6, 29:11, 39:19,
52:2, 57:11
**CERTIFICATE**[1] -
67:1
**certification**[2] - 29:5,
50:12
**certified**[1] - 67:8
**certify**[2] - 48:12,
67:4
**certifying**[1] - 34:21
**challenge**[2] - 52:1,
64:24
**change**[5] - 8:13,
8:22, 9:9, 64:11,
64:12
**changed**[2] - 8:19,
17:23
**changes**[1] - 63:12
**chanted**[2] - 52:23,
53:16
**chanting**[8] - 30:12,
30:14, 30:15, 31:6,
31:14, 52:14, 53:9,
53:23
**chants**[2] - 14:10,
14:11
**chaotic**[1] - 51:13
**chapter**[1] - 36:1
**characteristics**[5] -
16:20, 17:8, 20:25,
49:8, 55:17
**characterizes**[1] -
28:12
**charge**[3] - 13:8,

17:3, 54:23
**charged** [4] - 18:15,
20:4, 34:2, 48:24
**charges** [14] - 18:20,
18:24, 19:18, 20:10,
20:17, 39:24, 40:3,
41:4, 55:10, 55:23,
56:2, 60:24, 63:23
**charging** [2] - 19:22,
20:9
**check** [3] - 4:25, 6:2,
25:11
**chemical** [1] - 54:9
**cherished** [1] - 35:18
**Chicago** [1] - 35:23
**Chief** [1] - 64:4
**CHIEF** [1] - 1:9
**children** [2] - 56:16,
56:17
**choice** [1] - 43:7
**choose** [1] - 64:21
**chose** [3] - 51:12,
53:4, 55:1
**CHRISTINE** [1] - 1:21
**Christine** [1] - 2:6
**chronology** [1] - 18:19
**Circuit** [2] - 23:25,
51:24
**circumstances** [8] -
12:25, 14:3, 32:14,
38:19, 49:7, 49:21,
54:17, 63:13
**citizen** [2] - 29:1,
57:22
**City** [2] - 35:24, 35:25
**claim** [1] - 65:1
**clarified** [1] - 7:22
**clarify** [3] - 10:3,
10:16, 11:5
**clash** [5] - 14:17,
14:19, 15:5, 15:15
**clashes** [3] - 14:14,
14:23, 29:25
**Class** [4] - 23:11,
49:25, 58:23, 59:12
**clear** [6] - 3:4, 9:1,
13:22, 14:21, 50:1,
51:10
**clearly** [3] - 45:23,
46:8, 57:7
**Clerk** [3] - 64:1, 64:9,
64:12
**client** [2] - 37:2, 37:3
**client's** [1] - 35:3
**clients** [1] - 28:21
**climbing** [3] - 52:9,
53:7, 53:8
**Clock** [5] - 14:18,
16:8, 31:5, 31:17,
53:20

**close** [2] - 31:25, 32:1
**closer** [2] - 42:12,
42:13
**colleagues** [2] - 23:7,
23:14
**College** [2] - 33:9,
34:21
**colloquy** [1] - 11:12
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 64:3
**combination** [2] -
16:20, 17:7
**comfortable** [1] -
27:25
**commence** [1] - 63:18
**comment** [1] - 20:15
**commenting** [1] -
14:11
**commit** [1] - 61:21
**common** [1] - 21:14
**communication** [1] -
20:13
**community** [1] - 12:16
**comparator** [1] -
22:15
**comparators** [1] -
17:9
**compared** [1] - 12:13
**comparison** [1] -
29:11
**complete** [1] - 67:6
**completed** [3] - 47:8,
47:9, 56:18
**comply** [3] - 47:20,
62:16, 62:25
**computer** [1] - 1:24
**computer-aided** [1] -
1:24
**concept** [1] - 15:25
**concern** [1] - 36:21
**concerned** [1] - 35:1
**concerning** [1] - 34:22
**concert** [1] - 21:8
**concludes** [1] - 66:25
**conclusion** [1] - 24:15
**conclusions** [1] -
19:21
**concurs** [1] - 7:22
**condition** [3] - 23:18,
44:17, 60:25
**conditional** [3] - 40:3,
40:7, 41:16
**conditions** [5] - 61:9,
61:16, 61:17, 61:20,
62:17
**conduct** [41] - 13:5,
13:19, 16:15, 16:17,
17:1, 17:25, 18:6,
18:20, 18:21, 19:9,
20:2, 20:21, 21:9,

25:22, 28:13, 28:14,
29:10, 34:2, 39:23,
40:19, 41:3, 48:23,
49:11, 51:2, 51:3,
51:11, 54:21, 55:10,
55:11, 55:13, 55:25,
56:1, 56:25, 57:8,
57:12, 57:19, 59:25,
60:7, 60:11, 60:23,
61:18
**conducted** [1] - 41:3
**confer** [1] - 45:5
**confidential** [1] -
20:14
**confinement** [7] -
23:17, 59:10, 61:1,
61:10, 62:17, 62:19
**confirm** [1] - 11:13
**confirmed** [1] - 10:17
**confrontation** [3] -
52:19, 53:20, 55:6
**confrontations** [6] -
31:2, 42:2, 54:16,
55:2, 57:6, 60:18
**confronted** [1] - 51:22
**confusing** [3] - 10:1,
34:13
**confusion** [1] - 10:14
**Congress** [6] - 21:22,
31:20, 47:17, 48:10,
48:11, 48:17
**connection** [9] - 4:1,
4:6, 4:11, 12:3,
16:25, 28:8, 47:14,
48:25, 65:3
**consequence** [2] -
39:8, 59:21
**consider** [5] - 13:20,
20:20, 39:10, 47:17,
49:7
**consideration** [3] -
58:20, 61:2, 61:5
**considerations** [1] -
57:15
**considered** [1] - 67:8
**considering** [1] -
47:13
**consistent** [2] - 17:17,
23:1
**constitutes** [1] - 67:4
**Constitution** [2] -
48:10, 64:10
**constitutional** [1] -
48:9
**constitutionally** [1] -
31:4
**construction** [2] -
45:20, 45:21
**consult** [1] - 45:3
**context** [1] - 39:1

**contingent** [1] - 5:6
**continued** [2] - 43:19,
53:6
**contributing** [2] -
16:13, 27:6
**control** [3] - 31:24,
46:13, 53:2
**controlled** [3] - 61:23,
62:1, 62:2
**convey** [1] - 52:6
**convict** [1] - 20:19
**convicted** [9] - 17:2,
18:16, 20:1, 39:11,
49:11, 49:22, 55:14,
58:23, 59:12
**conviction** [17] - 10:3,
10:4, 10:9, 10:11,
10:15, 11:3, 17:18,
39:22, 40:8, 40:10,
49:14, 56:11, 59:24,
60:21, 64:24, 65:3
**convictions** [13] -
17:19, 17:21, 17:24,
18:2, 18:7, 41:3,
41:18, 55:17, 55:19,
55:21, 56:4, 57:10,
59:23
**cooperation** [1] -
26:14
**coordinate** [1] - 66:18
**coordinated** [1] -
66:20
**copies** [1] - 11:18
**correct** [15] - 3:7, 5:3,
5:4, 8:9, 9:15, 9:18,
9:22, 10:18, 17:6,
18:18, 19:14, 19:15,
26:21, 45:25, 46:4
**correction** [2] - 8:5,
8:6, 8:17
**correctly** [6] - 3:6,
7:25, 8:3, 8:9, 28:12,
41:18
**Corridor** [6] - 14:18,
15:15, 16:8, 31:5,
31:17, 53:20
**cost** [2] - 65:4, 65:6
**costs** [1] - 63:8
**couch** [1] - 10:24
**coughing** [1] - 30:21
**counsel** [9] - 2:8,
4:11, 6:16, 6:21,
7:21, 32:23, 45:5,
59:3, 65:2
**count** [2] - 48:11,
48:12
**Count** [2] - 3:10, 61:8
**country** [6] - 31:8,
35:7, 38:7, 48:9,
48:17

**country's** [1] - 57:20
**counts** [1] - 65:14
**Counts** [1] - 65:16
**County** [1] - 10:6
**couple** [1] - 35:21
**course** [15] - 4:7, 6:12,
7:5, 7:9, 12:21, 13:5,
19:9, 19:19, 20:18,
20:23, 21:1, 22:23,
26:22, 28:15, 28:16
**Court** [47] - 1:22, 1:22,
2:2, 5:2, 5:9, 6:24,
10:6, 12:22, 12:24,
13:3, 15:10, 16:7,
16:9, 17:12, 18:10,
18:13, 20:20, 21:12,
23:6, 23:25, 24:4,
24:5, 28:11, 29:13,
34:9, 35:21, 37:24,
39:19, 47:4, 49:15,
49:19, 59:5, 61:6,
62:5, 62:8, 62:13,
63:12, 64:2, 64:9,
64:12, 64:17, 64:19,
64:22, 65:5, 67:14
**court** [11] - 3:17, 3:20,
5:6, 5:21, 5:24, 8:4,
23:7, 24:2, 48:24,
63:5, 66:14
**COURT** [104] - 1:1,
1:9, 2:12, 2:15, 2:18,
2:20, 2:22, 2:25, 3:8,
5:10, 5:15, 5:17,
7:12, 8:7, 8:12, 8:21,
8:25, 9:4, 9:6, 9:9,
9:12, 9:20, 9:23,
11:4, 11:9, 11:12,
11:17, 11:19, 11:25,
12:6, 12:8, 16:23,
18:5, 18:18, 19:2,
19:6, 19:12, 19:23,
20:10, 20:16, 20:22,
20:24, 21:2, 22:3,
22:5, 22:11, 23:4,
25:15, 25:19, 26:5,
26:10, 26:18, 27:8,
27:17, 27:20, 27:22,
27:25, 29:17, 29:21,
33:17, 33:25, 34:10,
35:1, 35:13, 35:15,
36:24, 37:3, 37:20,
38:20, 38:23, 40:5,
40:10, 40:13, 40:15,
41:9, 41:22, 42:18,
42:21, 42:23, 43:3,
43:6, 43:10, 43:18,
44:10, 44:16, 44:23,
45:1, 45:4, 45:6,
47:6, 47:11, 51:9,
58:1, 58:8, 58:14,

58:18, 65:10, 65:12, 65:18, 65:22, 66:1, 66:11, 66:18, 66:24
**Court's** [2] - 20:6, 58:19
**court-issued** [1] - 3:20
**court-ordered** [1] - 63:5
**courthouse** [2] - 36:23, 36:24
**COURTROOM** [1] - 2:2
**courts** [1] - 22:24
**cousins** [1] - 5:7
**cover** [3] - 5:12, 14:5, 29:1
**covered** [1] - 49:15
**COVID** [1] - 5:20
**coy** [1] - 37:13
**CPA** [1] - 64:5
**crash** [1] - 56:19
**crawling** [1] - 50:18
**create** [2] - 32:13, 35:17
**credentials** [1] - 3:21
**credit** [4] - 13:16, 15:22, 63:23, 63:24
**crescendo** [1] - 19:10
**crime** [4] - 39:7, 39:11, 41:20, 61:22
**crimes** [3] - 40:24, 49:4, 57:14
**criminal** [43] - 10:5, 11:5, 17:1, 17:13, 17:15, 17:17, 18:3, 18:15, 18:19, 18:21, 21:4, 28:10, 28:17, 28:18, 29:8, 29:12, 29:15, 39:7, 39:21, 39:23, 40:19, 40:25, 41:2, 41:3, 41:4, 41:9, 48:23, 50:2, 55:15, 55:23, 56:6, 57:12, 57:14, 59:23, 59:25, 60:8, 60:19, 60:23, 60:24, 61:14, 62:12, 63:16
**Criminal** [2] - 1:3, 2:4
**critical** [1] - 57:15
**crosses** [1] - 14:1
**crowd** [33] - 14:12, 16:10, 16:11, 25:1, 30:6, 30:12, 30:14, 31:2, 31:6, 31:10, 31:12, 31:14, 31:16, 31:19, 31:24, 32:4, 32:7, 33:11, 33:15, 33:16, 44:3, 44:6, 46:1, 48:15, 50:8, 50:9, 50:15, 54:2,

54:8, 54:10, 57:5, 58:2
**crowds** [3] - 14:10, 30:12, 31:1
**crushed** [2] - 46:6, 46:9
**Crypt** [6] - 14:15, 15:1, 15:4, 15:15, 52:19, 55:7
**custodial** [2] - 54:20, 60:6

# D

**D.C** [11] - 1:6, 5:19, 23:24, 24:14, 43:25, 47:1, 47:2, 57:2, 64:6, 64:10, 66:14
**damage** [1] - 13:6
**damaged** [1] - 13:23
**danger** [1] - 15:16
**dangerous** [1] - 33:24
**dangerousness** [1] - 16:14
**data** [1] - 22:13
**date** [2] - 19:22, 63:18
**Dated** [1] - 67:12
**dates** [4] - 18:12, 18:23, 19:3
**daughter** [1] - 5:7
**days** [9] - 38:1, 61:9, 61:11, 62:3, 62:18, 62:20, 63:18, 64:11, 64:22
**deal** [1] - 33:20
**debrief** [2] - 15:8, 26:16
**decades** [1] - 55:18
**decide** [3] - 24:1, 59:6, 59:7
**decided** [2] - 15:11, 50:20
**deciding** [1] - 59:10
**decision** [4] - 20:9, 20:21, 60:16, 60:22
**decisions** [3] - 17:22, 20:8, 23:13
**deemed** [1] - 3:22
**deeper** [7] - 53:4, 53:8, 53:15, 54:15, 55:5, 60:19
**deeply** [1] - 37:15
**deescalate** [3] - 43:3, 43:4, 51:13
**defendant** [77] - 3:4, 4:13, 5:1, 13:7, 13:9, 13:10, 13:21, 14:4, 14:13, 14:20, 15:8, 15:16, 15:21, 16:1,

16:3, 16:8, 16:9, 16:11, 17:12, 17:14, 18:15, 19:10, 19:18, 20:19, 21:5, 24:8, 25:5, 26:17, 26:23, 27:1, 27:4, 30:9, 30:21, 30:23, 31:2, 31:8, 31:15, 31:25, 32:6, 32:8, 32:10, 32:21, 32:24, 34:5, 40:23, 40:24, 41:2, 41:10, 43:19, 45:5, 48:24, 49:14, 49:18, 50:8, 50:22, 51:16, 52:8, 52:13, 52:18, 53:14, 53:24, 54:4, 54:7, 54:10, 54:15, 55:9, 56:4, 56:12, 56:15, 57:15, 57:18, 58:23, 59:13, 59:15, 59:18, 60:4
**Defendant** [1] - 1:6
**DEFENDANT** [19] - 1:17, 2:17, 2:19, 2:21, 2:24, 3:7, 5:16, 7:11, 11:24, 12:5, 12:7, 44:25, 45:7, 47:10, 51:8, 57:24, 58:3, 58:10, 58:16
**defendant's** [21] - 12:14, 13:1, 13:19, 14:16, 16:19, 19:16, 20:25, 21:9, 22:17, 22:22, 26:11, 34:2, 39:21, 49:22, 51:6, 52:25, 54:21, 55:13, 55:16, 56:25, 63:15
**defendants** [13] - 7:2, 16:25, 17:2, 27:9, 32:19, 34:22, 39:6, 39:10, 39:20, 49:10, 54:22, 55:14, 60:6
**defense** [11] - 7:21, 9:10, 9:11, 9:13, 10:1, 20:3, 23:20, 24:7, 56:21, 59:3, 65:10
**defined** [1] - 64:23
**degree** [3] - 10:6, 10:11, 10:12
**delayed** [1] - 33:9
**demand** [1] - 37:18
**demanded** [1] - 37:18
**democracy** [6] - 21:19, 21:24, 25:4, 35:18, 40:22, 49:2
**democratic** [3] - 31:3, 34:19, 35:8
**democratically** [1] - 57:23

**demonstrated** [1] - 51:20
**demonstrating** [6] - 3:11, 33:22, 34:12, 49:23, 50:3, 50:5
**demonstration** [2] - 34:15, 52:1
**demonstrators'** [1] - 52:3
**denial** [1] - 3:21
**department's** [1] - 47:16
**depict** [1] - 25:6
**deploy** [2] - 32:5, 54:9
**DEPUTY** [1] - 2:2
**describe** [2] - 34:2, 35:5
**described** [2] - 43:22, 45:17
**describes** [2] - 36:2, 36:3
**designate** [1] - 66:7
**designated** [2] - 62:21, 62:23
**desks** [1] - 48:20
**despite** [3] - 50:19, 55:1, 56:10
**detail** [1] - 18:13
**details** [2] - 15:7, 20:14
**detention** [3] - 61:11, 62:24, 66:6
**deter** [6] - 40:19, 40:20, 40:23, 48:23, 57:13, 57:18
**determinations** [1] - 7:17
**determine** [2] - 6:15, 41:1, 49:16
**determined** [6] - 36:13, 36:15, 40:14, 62:5, 62:9, 62:13
**deterred** [2] - 57:11, 59:25
**deterrence** [2] - 40:23, 57:17
**deterring** [1] - 58:14
**device** [1] - 36:22
**difference** [1] - 29:21
**different** [20] - 6:15, 14:7, 15:25, 20:7, 28:20, 28:22, 29:6, 30:1, 36:4, 36:10, 36:11, 38:19, 39:17, 39:18, 47:22, 51:17, 51:20, 52:10, 61:10
**differentiations** [1] - 39:15
**differently** [1] - 22:25
**difficult** [2] - 21:18,

52:12
**difficulty** [1] - 25:7
**direct** [1] - 20:13
**directed** [1] - 63:1
**directing** [1] - 53:25
**direction** [1] - 22:17
**directly** [8] - 6:22, 7:3, 7:6, 15:4, 34:9, 42:14, 44:24, 45:2
**disability** [5] - 43:19, 56:20, 56:22, 57:9, 57:11
**disabled** [10] - 24:10, 25:6, 25:11, 25:22, 43:23, 44:4, 44:7, 44:11, 46:20, 56:19
**disagree** [1] - 59:17
**disassembled** [1] - 67:9
**disbursement** [1] - 64:3
**discharge** [1] - 40:8
**discharges** [2] - 40:4, 41:16
**disclosing** [1] - 20:14
**discontent** [1] - 57:21
**discretion** [1] - 63:8
**discuss** [1] - 13:13
**discussing** [1] - 18:9
**dismiss** [2] - 65:13, 65:16
**dismissal** [2] - 40:11, 40:12
**dismissed** [1] - 10:10
**disobey** [1] - 57:22
**disorderly** [2] - 20:1, 55:25
**disparities** [4] - 22:8, 39:6, 49:10, 60:4
**disrupt** [2] - 34:19, 58:6
**disrupted** [2] - 48:14, 50:11
**disrupting** [1] - 40:20
**disruption** [2] - 48:3, 48:8
**dissatisfaction** [1] - 57:20
**distinguish** [2] - 13:12, 55:13
**distinguishing** [1] - 40:15
**distracting** [1] - 4:5
**district** [2] - 24:2, 64:16
**DISTRICT** [3] - 1:1, 1:1, 1:9
**District** [5] - 1:13, 45:7, 64:2, 64:9
**disturb** [1] - 37:23

divergent [2] - 12:10, 23:7
divided [1] - 6:14
docket [1] - 4:23
docketed [8] - 4:8, 4:10, 4:13, 4:14, 4:16, 4:20, 4:21, 10:17
document [1] - 11:1
documents [4] - 4:3, 4:10, 6:9, 12:3
DOJ [1] - 1:12
DOJ-USAO [1] - 1:12
dollar [1] - 59:23
domestic [1] - 41:17
Donald [1] - 45:14
done [3] - 8:24, 25:13, 25:16
door [3] - 15:3, 45:21, 45:23
doors [3] - 29:22, 45:17, 53:18
doubt [1] - 20:19
down [8] - 25:4, 31:23, 31:24, 43:8, 44:2, 50:15, 53:16, 57:8
dozen [2] - 28:22, 51:22
drawn [1] - 19:21
Drive [2] - 1:14, 1:17
drive [5] - 24:14, 24:16, 37:8, 43:24, 57:1
driving [1] - 57:7
drove [4] - 24:13, 24:14, 25:5, 50:13
drug [2] - 62:3, 62:4
due [7] - 53:12, 55:14, 56:11, 56:20, 60:15, 60:21, 63:16
DUI [1] - 59:24
during [9] - 6:12, 7:5, 7:9, 14:9, 14:14, 25:12, 41:22, 41:24, 55:6

**E**

early [2] - 15:5, 57:1
easier [1] - 22:9
ECF [7] - 4:9, 4:10, 4:13, 4:14, 4:17, 4:23, 10:17
economic [1] - 63:12
education [1] - 63:3
Edward [1] - 35:22
effect [2] - 21:23, 65:24
effects [1] - 26:23

effort [2] - 23:1, 34:19
eight [3] - 17:19, 41:2, 55:17
either [1] - 10:9
elected [1] - 57:23
election [4] - 29:5, 33:8, 48:13, 50:12
elections [1] - 40:21
electoral [1] - 48:11
Electoral [2] - 33:9, 34:21
electricity [1] - 35:11
electronic [1] - 4:21
eliminated [3] - 8:14, 9:19, 9:24
Elizabeth [2] - 1:22, 67:13
ELIZABETH [1] - 67:3
Ellipse [1] - 50:16
elsewhere [1] - 7:24
email [1] - 9:16
Email [2] - 1:15, 1:19
emboldens [1] - 33:4
employed [1] - 56:18
employment [1] - 63:3
encountered [2] - 16:6, 38:3
end [3] - 13:14, 22:23, 46:15
enforcement [9] - 21:22, 26:13, 41:25, 42:3, 42:10, 50:10, 50:23, 52:11, 52:20
engage [4] - 25:22, 32:10, 60:13, 60:22
engaged [7] - 18:19, 24:22, 52:19, 53:19, 55:9, 57:5, 57:7
engaging [8] - 39:23, 51:2, 52:24, 57:5, 57:12, 57:18, 58:15, 59:25
ensure [2] - 47:18, 60:12
enter [1] - 14:5
entered [7] - 13:21, 15:2, 21:5, 26:25, 48:14, 52:8, 64:24
entering [4] - 42:2, 50:24, 52:18, 65:2
enters [1] - 64:22
entrances [1] - 30:2
entry [6] - 3:21, 13:24, 14:3, 42:6, 42:9, 42:12
entryways [1] - 51:21
equal [1] - 63:17
error [1] - 7:22
especially [1] - 28:9
essentially [2] - 15:12,

17:14
establish [1] - 61:17
evacuate [1] - 51:19
evacuated [4] - 30:18, 34:20, 48:20, 53:13
evacuating [1] - 31:20
evacuation [1] - 48:16
evaluating [1] - 29:15
evening [1] - 38:4
event [1] - 36:8
events [5] - 16:8, 27:7, 28:5, 29:2, 39:13
eventually [1] - 51:15
evidence [4] - 11:1, 13:8, 14:20, 25:9
evolution [1] - 36:3
evolutions [1] - 36:3
ex [1] - 38:17
ex-Marine [1] - 38:17
exactly [2] - 30:11, 43:5
except [1] - 63:3
excitement [1] - 25:3
excused [1] - 66:24
execute [1] - 64:17
Exhibit [5] - 13:25, 14:16, 14:18, 30:12, 31:5
exhibits [1] - 24:12
exit [2] - 15:11, 15:18
exited [1] - 54:11
expectations [1] - 61:18
experience [1] - 42:25
explain [3] - 6:9, 6:25, 47:11
explained [1] - 51:25
explaining [1] - 66:23
explicitly [1] - 52:6
expression [1] - 57:21
extending [1] - 55:18
eye [1] - 34:1

**F**

face [1] - 42:18
facilitate [1] - 50:10
facility [4] - 62:21, 62:23, 65:24, 66:7
facing [7] - 18:20, 39:24, 40:2, 41:3, 48:24, 54:22, 55:10
fact [5] - 35:9, 42:24, 51:1, 53:12, 55:6
factor [9] - 15:19, 16:19, 20:24, 21:14, 22:4, 22:7, 29:16, 30:8, 40:16
factors [16] - 12:21,

12:22, 13:2, 13:3, 13:14, 13:15, 13:17, 13:20, 21:11, 22:25, 23:3, 39:17, 47:17, 55:13, 60:15, 61:3
facts [1] - 18:6
factual [2] - 6:17, 7:17
fairly [2] - 17:11, 56:24
fall [1] - 43:2
familiar [1] - 35:22
family [5] - 5:2, 5:7, 6:11, 38:21, 41:17, 41:20, 47:4
far [3] - 23:12, 25:17, 54:22
fashioning [2] - 39:9, 40:17
fathom [1] - 21:18
fault [1] - 43:14
favor [2] - 21:25, 43:20
favors [1] - 54:19
FBI [4] - 26:17, 37:10, 37:11, 41:24
FCRR [3] - 1:22, 67:3, 67:13
fear [1] - 21:21
Federal [1] - 1:13
federal [1] - 61:21
federally [1] - 62:1
feelings [1] - 33:8
feet [1] - 30:4
fellow [1] - 51:16
felon [1] - 20:5
felonies [1] - 23:11
felony [8] - 10:12, 17:18, 18:15, 19:14, 29:9, 39:22, 56:11, 60:21
felt [1] - 33:8
few [2] - 17:20, 32:17
fight [1] - 46:15
fighting [2] - 45:17, 55:25
file [4] - 7:20, 10:20, 64:21, 65:5
filed [3] - 7:15, 10:9, 12:3
filing [1] - 4:21
film [1] - 44:6
filmed [2] - 13:24, 50:16
filming [4] - 31:10, 36:23, 37:6, 52:25
films [1] - 31:10
final [2] - 7:14, 20:8
finally [1] - 54:6
Financial [1] - 64:4
financial [8] - 59:14, 63:10, 63:14, 63:20,

63:21, 63:22, 64:8, 64:13
fine [8] - 46:21, 59:13, 59:16, 59:23, 60:1, 61:14, 62:12, 66:22
fines [2] - 56:5, 59:22
finish [2] - 22:6, 54:14
firearm [1] - 10:6
firearms [5] - 19:11, 56:11, 56:13, 60:20, 60:22
First [1] - 50:5
first [14] - 6:15, 6:20, 7:13, 12:23, 14:6, 15:2, 21:12, 48:2, 48:4, 52:19, 53:6, 54:23, 55:6, 62:21
five [10] - 8:1, 8:20, 21:5, 24:13, 24:16, 25:5, 30:3, 43:24, 51:25, 57:1
five-hour [3] - 24:13, 24:16, 43:24
flack [1] - 36:1
flag [3] - 8:4, 33:21, 41:5
flash [1] - 43:11
flash-bangs [1] - 43:11
flip [1] - 9:3
floor [4] - 14:7, 15:3, 53:6
focus [2] - 12:21, 12:24
follow [1] - 62:22
followed [1] - 12:12
following [6] - 15:22, 50:9, 53:16, 61:16, 62:16, 64:3
follows [1] - 63:17
food [1] - 35:12
footage [2] - 31:18, 54:7
FOR [3] - 1:1, 1:12, 1:17
forced [1] - 48:16
Ford [1] - 64:5
foregoing [1] - 67:4
form [1] - 57:17
formal [1] - 10:20
format [1] - 4:20
formed [1] - 48:15
former [2] - 24:15, 28:23
forth [1] - 9:25
forward [2] - 2:8, 7:6, 31:12, 31:13, 45:2, 53:24, 53:25, 54:3
four [5] - 12:21, 19:24, 34:2, 36:5, 56:13

fourth [2] - 10:12, 28:3
frame [2] - 19:25, 56:14
fraught [1] - 36:19
friends [2] - 5:2, 6:11
front [16] - 14:13, 14:23, 24:22, 27:12, 31:25, 32:22, 38:5, 39:4, 45:24, 45:25, 52:25, 54:1, 54:5, 55:3, 60:17, 66:13
fruition [1] - 21:21
fuck [2] - 31:7
Fuck [1] - 31:14
fucking [1] - 31:22
full [2] - 64:13, 67:5
fully [5] - 2:20, 2:25, 5:11, 11:22, 28:1
Fun [1] - 36:2
fundamental [1] - 48:8
future [4] - 3:21, 40:24, 49:4, 57:14

**G**

GA [1] - 1:14
Garcia [1] - 51:24
gas [7] - 14:11, 30:20, 30:22, 32:6, 32:8, 32:15, 43:10
general [2] - 21:25, 49:15
generally [1] - 54:19
Georgia [1] - 1:13
given [3] - 31:19, 43:24, 60:7
glass [5] - 13:23, 29:24, 45:17, 45:18, 45:20
God [1] - 30:17
GoPro [2] - 36:22, 37:12
GoPros [1] - 37:7
government [57] - 4:12, 4:14, 4:19, 4:23, 6:16, 6:21, 7:16, 7:19, 7:22, 8:6, 9:10, 9:20, 10:2, 10:15, 10:16, 11:1, 12:11, 12:17, 13:2, 13:15, 13:20, 14:24, 15:8, 15:14, 16:21, 17:3, 18:3, 19:12, 19:17, 19:23, 21:7, 21:10, 22:15, 22:19, 23:4, 25:8, 25:16, 25:25, 26:3, 26:19, 28:11, 28:12, 30:6, 34:11, 36:18, 37:21,

37:23, 37:25, 41:23, 43:23, 49:17, 57:23, 58:25, 65:8, 65:13, 65:16, 65:20
GOVERNMENT [1] - 1:12
Government's [3] - 13:25, 14:15, 14:18
government's [10] - 12:19, 15:1, 16:18, 16:24, 22:21, 22:25, 23:15, 24:12, 25:18, 27:3
governmental [1] - 55:24
grade [1] - 56:18
granted [1] - 65:18
great [2] - 33:20, 44:5
greater [1] - 47:19
greatest [1] - 35:10
ground [1] - 16:21
group [1] - 33:23
groups [1] - 29:4
growing [1] - 16:24
grows [1] - 22:10
guess [4] - 9:17, 29:14, 40:2, 40:7
guilty [3] - 3:9, 13:11, 65:3
gun [2] - 19:14, 39:22
guns [4] - 19:24, 39:23, 43:7, 43:15
guy [1] - 38:24
guys [1] - 38:25

**H**

H2-205B [1] - 64:6
hallway [1] - 53:16
hallways [1] - 53:6
hand [2] - 42:16, 53:24
handled [1] - 26:8
hands [2] - 44:4, 44:6
happy [1] - 44:21
harassment [2] - 18:4, 55:24
hard [2] - 29:25, 37:8
harder [1] - 22:10
harm [1] - 51:13
head [2] - 32:17, 44:6
heading [2] - 53:7, 53:9
heads [1] - 30:4
health [1] - 63:5
hear [6] - 6:20, 12:9, 27:5, 28:23, 29:24, 33:7
heard [5] - 13:25, 14:1, 28:11, 45:15,

58:2
hearing [16] - 3:12, 3:15, 3:25, 4:11, 6:10, 6:13, 7:5, 7:9, 12:9, 15:10, 16:3, 16:7, 41:23, 47:16, 58:21, 60:9
HEARING [1] - 1:8
hearings [3] - 3:22, 6:14
heavily [1] - 58:19
heightened [1] - 5:19
held [2] - 3:18, 25:2
helped [2] - 31:3, 50:9
helpful [3] - 6:10, 6:11, 16:24
helping [4] - 24:2, 32:13, 58:8, 58:9
hereby [2] - 61:7, 67:3
hid [1] - 48:19
higher [1] - 16:21
highlight [1] - 21:11
highlights [1] - 57:16
highly [1] - 32:23
Hill [2] - 34:4, 34:6
himself [6] - 5:3, 32:9, 34:9, 38:9, 44:22, 55:3
histories [1] - 39:8
history [20] - 11:5, 16:19, 17:13, 17:15, 17:17, 17:18, 20:25, 21:4, 28:7, 28:10, 28:18, 29:9, 40:25, 41:2, 48:3, 48:5, 49:8, 55:16, 60:8, 60:19
hit [1] - 46:14
hold [2] - 31:15, 33:21
holding [6] - 32:2, 32:14, 46:3, 46:6, 46:7, 46:9
home [9] - 21:6, 25:5, 39:23, 43:24, 45:13, 57:7, 61:11, 62:24, 66:6
honest [1] - 32:22
honestly [1] - 28:12
Honor [55] - 2:5, 2:10, 2:13, 5:4, 7:19, 8:5, 8:16, 8:23, 9:2, 9:5, 9:22, 11:8, 11:11, 12:18, 12:19, 17:6, 17:10, 18:8, 18:14, 19:8, 19:15, 19:22, 20:9, 20:12, 21:1, 22:2, 22:14, 25:14, 25:25, 26:2, 26:6, 26:16, 26:21, 27:19, 27:21, 27:23, 27:24,

28:5, 35:6, 37:2, 37:5, 40:1, 41:15, 42:14, 44:19, 44:20, 45:7, 47:5, 57:25, 65:9, 65:11, 65:15, 65:21, 66:8
HONORABLE [1] - 1:9
hope [5] - 27:15, 27:16, 27:17, 35:16
hour [3] - 24:13, 24:16, 43:24
hours [2] - 12:16, 25:6, 57:1
house [8] - 30:13, 31:6, 45:9, 46:11, 53:17
House [5] - 24:17, 30:17, 52:14, 53:11, 64:5
HOWELL [1] - 1:9
hundreds [1] - 51:23
hurt [1] - 28:6

**I**

iCloud [1] - 14:16
identified [4] - 13:3, 22:16, 22:19, 38:9
identifies [1] - 36:5
identify [1] - 36:6
ignorance [1] - 46:17
ignore [1] - 16:6
imagine [1] - 37:20
immediately [1] - 64:8
implicitly [1] - 52:6
importance [1] - 58:14
important [9] - 10:15, 11:6, 12:23, 15:7, 36:5, 39:19, 40:20, 48:21, 50:25
importantly [1] - 16:7
impose [4] - 6:25, 7:1, 47:12, 47:18
imposed [11] - 16:25, 47:25, 56:8, 57:13, 59:4, 60:5, 61:3, 61:17, 64:19, 64:25, 65:7
imposition [1] - 60:1
impossible [1] - 22:15
impression [1] - 56:9
imprisonment [4] - 12:12, 58:24, 59:2, 64:20
inaction [1] - 51:10
incarceration [13] - 16:16, 16:17, 16:22, 17:4, 21:8, 21:25, 22:20, 22:21, 23:5,

23:16, 23:23, 56:22, 59:9
include [5] - 13:19, 17:18, 47:24, 60:25, 61:20
included [2] - 26:23, 28:5
includes [3] - 5:6, 61:24, 64:16
including [7] - 3:18, 3:20, 6:5, 13:1, 13:23, 29:9, 60:20
income [1] - 59:19, 59:20
incorrect [1] - 9:19
increased [1] - 5:18
incredibly [1] - 51:13
increments [1] - 61:10
incur [1] - 63:23
indicated [1] - 59:15
indicating [1] - 27:5
indignation [1] - 36:7
individual [1] - 13:1
ineffective [1] - 65:2
inference [2] - 18:25, 19:7
inform [1] - 24:3
information [11] - 3:10, 4:16, 10:16, 10:18, 59:14, 61:8, 63:20, 63:21, 63:22, 65:1, 65:17
initial [1] - 13:4
injuries [1] - 24:9
innocent [1] - 21:22
inside [26] - 14:4, 14:9, 14:15, 15:10, 15:13, 15:17, 17:7, 30:7, 30:8, 30:9, 30:25, 33:11, 34:15, 34:23, 36:24, 37:6, 42:3, 50:7, 50:20, 51:18, 52:11, 52:16, 54:13, 54:23, 57:3
installments [1] - 63:17
instance [2] - 17:21, 18:14
instances [4] - 13:2, 18:11, 18:21, 52:10
instant [1] - 56:12
instead [1] - 53:5
instilled [1] - 21:21
institutions [1] - 35:8
insurrection [1] - 38:6
intention [3] - 45:11, 45:12, 66:1
interactions [1] - 56:6
interest [4] - 62:9, 62:10, 62:14

**interested** [1] - 25:21
**interesting** [1] - 29:7
**intermittent** [7] - 23:17, 59:10, 60:25, 61:9, 62:17, 62:19
**internal** [1] - 37:8
**interpretation** [1] - 27:3
**interrupt** [1] - 33:17
**interrupting** [1] - 58:18
**interview** [4] - 26:12, 26:22, 37:13, 41:24
**interviews** [1] - 37:11
**investigation** [9] - 4:8, 6:18, 7:14, 11:14, 12:2, 20:14, 33:10, 47:15, 64:15
**invitation** [1] - 52:7
**invited** [1] - 42:16
**involve** [3] - 13:6, 41:16, 41:19
**involved** [3] - 22:19, 29:2, 42:25
**involvement** [1] - 34:3
**involving** [2] - 28:13, 40:3
**issue** [11] - 13:5, 15:20, 20:18, 23:6, 23:12, 23:19, 23:21, 23:24, 24:3, 24:6, 37:23
**issued** [4] - 3:20, 20:18, 23:13, 59:23
**issues** [1] - 56:24

## J

**January** [28] - 17:1, 18:20, 28:5, 34:4, 34:6, 34:14, 34:17, 34:23, 35:17, 39:13, 39:24, 42:7, 45:9, 48:2, 48:7, 48:15, 48:25, 50:4, 55:10, 55:15, 56:1, 57:1, 57:2, 57:8, 60:6, 60:14, 60:23
**job** [2] - 34:21, 48:18
**joined** [5] - 14:20, 33:10, 36:12, 53:7, 53:21
**joining** [2] - 2:6, 2:7
**joint** [1] - 59:19
**Joint** [1] - 48:11
**journalist** [1] - 29:1
**Judge** [1] - 36:21
**JUDGE** [1] - 1:9
**judge** [7] - 3:23, 39:9,

39:16, 40:16, 45:7, 48:24, 57:16
**judges** [3] - 22:12, 24:2, 39:8
**judgment** [6] - 56:2, 60:23, 61:6, 63:11, 63:18, 64:22
**July** [1] - 55:12
**June** [2] - 55:12, 67:12
**jurisdiction** [1] - 66:11
**jury** [1] - 10:4
**justice** [2] - 37:17, 56:6
**justifies** [1] - 16:16

## K

**Kathy** [1] - 64:5
**keep** [6] - 5:12, 6:1, 6:4, 25:1, 31:18, 43:8
**KELLI** [1] - 1:20
**Kelli** [1] - 2:5
**kicking** [1] - 53:18
**kill** [1] - 35:16
**kind** [8] - 25:22, 29:1, 33:22, 36:19, 37:13, 37:16, 37:19, 43:2
**known** [1] - 19:6
**knows** [1] - 30:18
**Kotelly** [1] - 36:21
**KRAEMER** [1] - 1:20
**Kraemer** [1] - 2:5
**KRAEMER-SOARES** [1] - 1:20
**Kraemer-Soares** [1] - 2:5

## L

**lady** [1] - 46:8
**Lady** [1] - 45:7
**language** [1] - 8:14
**large** [1] - 5:5
**last** [5] - 6:24, 22:4, 22:7, 24:16, 55:21
**lasting** [1] - 21:23
**late** [1] - 27:18
**law** [20] - 21:14, 21:18, 21:22, 26:12, 34:19, 41:25, 42:2, 42:10, 46:18, 48:7, 48:8, 48:9, 48:21, 50:10, 50:22, 51:9, 52:11, 52:20, 54:19, 57:22
**lawful** [2] - 51:4, 52:16
**lawyer** [2] - 36:19, 42:24

**lawyers** [2] - 39:1, 39:9
**lead** [1] - 41:17
**leads** [3] - 16:21, 19:9, 45:19
**leaning** [2] - 19:25, 56:14
**leanings** [1] - 29:2
**least** [3] - 22:16, 28:20, 62:4
**leave** [4] - 14:25, 32:15, 45:9, 55:1
**led** [1] - 21:9
**left** [6] - 29:23, 30:5, 32:17, 38:3, 46:17, 56:19
**legal** [10] - 23:6, 23:12, 23:19, 23:24, 24:3, 27:4, 38:17, 51:5, 51:11, 51:25
**legitimate** [1] - 57:20
**lending** [1] - 33:23
**lends** [1] - 33:15
**lengthy** [3] - 29:8, 41:6, 60:11
**less** [4] - 22:22, 30:2, 54:24
**letter** [1] - 5:3
**letters** [1] - 5:2
**level** [1] - 18:17
**license** [1] - 57:22
**Life** [1] - 46:24
**lifecycle** [1] - 17:20
**likely** [1] - 21:7
**likewise** [1] - 13:8
**limitations** [1] - 19:20
**limited** [3] - 17:5, 17:11, 49:17
**line** [15] - 3:13, 3:16, 8:17, 24:23, 32:1, 32:2, 38:5, 45:24, 45:25, 51:14, 52:20, 53:1, 53:21, 54:4, 55:7
**lines** [3] - 24:24, 51:22, 52:15, 55:3, 63:24
**listed** [1] - 13:15
**listen** [2] - 3:14, 45:12
**listening** [1] - 3:15
**lives** [1] - 51:14
**loaded** [3] - 10:5, 19:25, 56:13
**local** [2] - 61:22, 61:25
**location** [5] - 63:1, 63:7, 63:8, 66:2, 66:19
**locations** [1] - 30:10
**look** [11] - 25:10, 26:4, 39:19, 40:25, 41:9,

41:10, 43:23, 46:6, 46:10, 53:14, 59:22
**looked** [5] - 4:1, 16:23, 17:10, 24:20, 29:22
**looking** [12] - 14:12, 16:17, 17:14, 20:24, 21:4, 25:17, 30:16, 39:17, 40:17, 52:14, 53:5, 53:10
**looks** [4] - 25:6, 31:9, 44:4, 44:11
**losing** [1] - 35:16
**loss** [1] - 64:7
**Loth** [2] - 1:22, 67:13
**LOTH** [1] - 67:3
**lower** [1] - 18:17
**luxury** [1] - 35:10
**lynching** [1] - 53:10

## M

**machine** [3] - 1:24, 43:7, 43:15
**Mahopac** [1] - 24:13
**man** [3] - 25:6, 44:4, 44:11
**management** [1] - 4:21
**mandated** [1] - 31:4
**mandatory** [2] - 61:16, 61:20
**manner** [1] - 67:10
**march** [1] - 46:24
**March** [1] - 7:15
**marched** [1] - 50:15
**marijuana** [3] - 61:24, 61:25
**Marine** [1] - 38:17
**married** [1] - 56:15
**marshals** [1] - 5:23
**mask** [4] - 2:23, 3:1, 5:11, 27:24
**masks** [2] - 5:13, 6:4
**mathematical** [1] - 22:24
**matter** [5] - 2:3, 13:4, 40:3, 51:7, 61:24
**matters** [1] - 43:1
**maximum** [3] - 58:24, 59:13, 64:20
**mayhem** [1] - 50:19
**McConnell** [1] - 31:7
**MD** [1] - 1:18
**mean** [6] - 9:3, 19:23, 29:17, 32:16, 34:10, 44:11
**meaning** [1] - 5:23
**media** [3] - 3:20, 13:9,

26:13
**medical** [3] - 44:16, 56:24, 63:4
**medication** [1] - 43:20
**meet** [1] - 48:10
**member** [3] - 27:10, 41:17, 41:20
**members** [4] - 5:7, 21:22, 31:20, 48:17
**memo** [9] - 10:1, 10:8, 10:17, 34:1, 34:8, 35:2, 41:24, 43:18, 56:21
**memoranda** [1] - 47:13
**memorandum** [5] - 4:13, 4:14, 4:15, 7:21, 19:17
**mental** [1] - 63:4
**mention** [1] - 35:20
**mentioned** [4] - 15:20, 15:24, 17:6, 56:3
**mere** [1] - 16:12
**message** [1] - 33:22
**middle** [1] - 46:5
**midst** [2] - 30:20, 32:12
**might** [5] - 10:21, 16:5, 25:21, 36:11, 63:13
**mild** [1] - 29:11
**miles** [4] - 24:18, 44:1, 50:15, 57:3
**mind** [2] - 29:1, 32:11
**minimize** [1] - 51:12
**minute** [1] - 29:23
**minutes** [14] - 14:4, 21:6, 24:20, 30:3, 30:9, 32:17, 52:17, 54:13, 54:23, 54:24, 54:25, 57:4, 60:17
**mischief** [3] - 18:3, 18:16, 55:23
**misdemeanor** [8] - 10:10, 10:13, 13:7, 18:16, 49:25, 55:23, 58:23, 59:12
**misdemeanors** [4] - 18:1, 18:2, 23:11, 34:3
**misspoke** [1] - 37:1
**mob** [16] - 24:23, 27:9, 27:10, 30:19, 52:14, 53:1, 53:7, 53:11, 53:13, 53:21, 53:22, 54:1, 54:3, 54:5, 55:8, 60:17
**mobile** [1] - 57:7
**mobility** [3] - 24:21, 25:7, 44:5

**mobs** [3] - 33:2,
51:23, 55:4
**moment** [3] - 13:13,
17:9, 27:11
**monetary** [1] - 63:16
**monitor** [1] - 66:4
**monitoring** [5] -
23:13, 63:1, 63:7,
63:9, 66:2
**Montana** [1] - 37:16
**month** [1] - 24:10
**monthly** [2] - 56:20,
63:17
**months** [7] - 12:15,
17:4, 58:25, 59:1,
61:7, 61:11, 62:25
**months'** [4] - 12:12,
23:5, 23:16
**morning** [10] - 2:10,
2:12, 2:13, 2:15,
2:16, 2:17, 3:3, 5:6,
9:17, 57:2
**most** [7] - 12:23,
14:13, 43:14, 48:8,
51:21, 55:19, 56:4
**motion** [2] - 65:13,
65:18
**motivation** [1] - 33:10
**motivations** [3] -
28:22, 29:6, 36:4
**mouth** [1] - 46:12
**mouths** [1] - 5:12
**move** [1] - 65:16
**movement** [1] - 52:2
**moving** [1] - 60:19
**mow** [1] - 43:7
**MR** [50] - 2:13, 5:4,
5:14, 8:23, 9:2, 9:5,
9:8, 9:11, 9:15,
10:23, 11:8, 11:11,
11:16, 11:18, 27:23,
28:3, 29:20, 33:1,
33:19, 34:7, 34:25,
35:4, 35:14, 35:20,
37:1, 37:5, 37:21,
38:22, 40:1, 40:6,
40:11, 40:14, 41:8,
41:14, 42:11, 42:20,
42:22, 42:24, 43:4,
43:9, 43:16, 44:8,
44:13, 44:18, 45:3,
65:11, 65:23, 66:8,
66:15, 66:22
**MS** [33] - 2:10, 7:19,
8:9, 8:16, 9:22,
12:18, 17:5, 18:8,
18:22, 19:4, 19:7,
19:15, 20:6, 20:12,
20:17, 20:23, 21:1,
21:3, 22:4, 22:7,

22:13, 25:14, 25:16,
25:24, 26:6, 26:16,
26:21, 27:16, 27:18,
27:21, 65:9, 65:15,
65:21
**multiple** [4] - 30:8,
30:10, 30:25, 57:10
**must** [17] - 5:25,
31:11, 40:4, 47:17,
61:21, 61:23, 62:1,
62:2, 62:6, 62:18,
62:22, 62:24, 63:10,
63:12, 63:19, 63:23,
64:21

**N**

**name** [2] - 3:6, 38:9
**names** [1] - 2:8
**Nancy** [10] - 30:15,
30:18, 30:19, 31:7,
44:2, 44:3, 46:11,
53:9, 53:10
**Nathan** [1] - 2:14
**NATHAN** [1] - 1:17
**nature** [5] - 10:3,
12:24, 49:7, 49:21,
54:17
**necessary** [3] - 3:22,
47:19, 51:6
**need** [10] - 8:14,
21:12, 22:8, 47:24,
49:9, 49:12, 54:18,
57:13, 57:17, 60:3
**neglected** [1] - 9:17
**never** [6] - 37:12,
37:17, 37:18, 37:21,
47:1
**New** [11] - 5:16, 5:17,
5:18, 10:7, 18:21,
20:11, 24:13, 50:13,
55:11, 55:23, 60:24
**new** [3] - 20:17, 63:23,
64:25
**news** [3] - 18:8, 38:3,
38:4
**next** [1] - 16:19
**night** [2] - 38:5, 45:9
**nine** [1] - 17:2
**nisquire@aol.com** [1]
- 1:19
**nobody** [2] - 46:14,
46:15
**noncharging** [1] -
19:22
**noncustodial** [1] -
43:21
**none** [5] - 13:14,
46:11, 58:4, 58:5,

58:6
**nonetheless** [1] - 2:22
**normal** [1] - 45:20
**normally** [1] - 3:25
**Northern** [1] - 1:13
**Northwest** [1] - 64:10
**Nos** [1] - 4:23
**noses** [1] - 5:12
**nostrils** [1] - 30:22
**notable** [1] - 17:20
**notably** [1] - 14:13
**note** [4] - 5:9, 7:21,
8:6, 19:16
**noted** [2] - 60:15, 65:8
**notes** [1] - 67:5
**nothing** [4] - 16:10,
43:13, 45:22, 46:22
**notice** [2] - 15:12,
18:24
**noticed** [2] - 4:23,
27:8
**notified** [1] - 65:25
**notify** [1] - 63:12,
64:11
**nowhere** [1] - 46:10
**null** [1] - 67:8
**number** [5] - 13:19,
14:7, 17:5, 17:11,
47:21

**O**

**objection** [6] - 7:17,
8:24, 9:14, 9:21,
10:20, 10:21
**objections** [7] - 6:17,
6:19, 7:20, 9:6, 9:13,
11:10, 65:7
**obligation** [2] - 6:1,
64:13
**obligations** [2] - 63:5,
64:8
**observation** [2] - 38:8,
38:11
**observations** [2] -
28:19, 44:20
**obstructed** [1] - 37:17
**obstructing** [1] -
55:24
**obstruction** [1] - 18:2
**obtain** [1] - 11:2
**obtained** [1] - 37:22
**obviously** [1] - 22:13
**Occupy** [1] - 52:2
**occurred** [3] - 21:19,
55:21, 60:14
**occurring** [1] - 15:17
**OF** [3] - 1:1, 1:3, 1:8
**offenders** [1] - 54:25

**offense** [32] - 3:9,
12:25, 13:11, 17:3,
18:1, 18:6, 18:17,
19:14, 21:13, 23:9,
23:10, 30:6, 34:11,
39:19, 39:22, 47:25,
48:1, 48:23, 49:8,
49:12, 49:22, 49:25,
54:17, 54:21, 54:23,
54:25, 55:14, 56:12,
60:7, 60:11, 65:3
**offenses** [6] - 19:18,
19:20, 20:20, 32:19,
34:3, 39:25
**offered** [1] - 34:11
**office** [16] - 4:10, 9:16,
12:13, 12:15, 20:7,
20:10, 20:12, 20:13,
37:25, 53:9, 63:8,
63:21, 64:14, 66:17,
66:18, 66:19
**Office** [7] - 20:11,
63:2, 63:7, 63:23,
64:4, 64:5, 64:16
**office's** [2] - 4:8, 12:2
**Officer** [3] - 1:20, 2:5,
64:5
**officer** [7] - 4:4, 31:18,
46:5, 46:8, 59:14,
63:19, 63:25
**officers** [22] - 24:23,
31:14, 31:22, 31:23,
32:1, 32:3, 32:4,
33:3, 41:25, 51:12,
51:22, 52:20, 53:2,
53:20, 53:21, 53:23,
54:7, 54:8, 54:9,
54:16, 57:6
**offices** [1] - 66:21
**Official** [1] - 1:22
**official** [1] - 67:14
**often** [2] - 35:9, 51:6
**Ohio** [6] - 14:18,
15:15, 16:8, 31:5,
31:17, 53:20
**once** [2] - 53:14, 65:25
**one** [38] - 4:25, 7:21,
7:24, 8:19, 12:23,
14:15, 16:21, 17:18,
17:21, 18:9, 18:14,
19:24, 24:1, 24:6,
24:25, 28:25, 29:9,
30:5, 33:22, 33:25,
34:25, 35:4, 36:6,
36:16, 36:22, 37:15,
41:14, 42:16, 46:21,
50:1, 53:24, 56:13,
56:16, 56:17, 57:24,
61:21, 62:3, 65:23
**one's** [1] - 33:23

**open** [4] - 8:4, 40:7,
63:23, 65:14
**opportunities** [2] -
14:25, 15:17
**opportunity** [3] - 7:3,
44:24, 45:1
**opposed** [1] - 42:17
**Orchid** [1] - 1:17
**order** [2] - 49:19,
64:17
**Order** [1] - 3:17
**ordered** [4] - 61:12,
62:7, 62:12, 63:5
**otherwise** [1] - 8:24
**outnumbered** [3] -
51:15, 53:2, 55:4
**outside** [6] - 15:9,
26:24, 41:25, 42:3,
50:20, 50:23
**overcome** [1] - 55:4
**oversight** [1] - 9:17
**overthrow** [2] - 57:23,
57:25
**overthrowing** [1] -
58:17
**overwhelm** [1] - 31:3
**overwhelmed** [5] -
42:19, 48:16, 50:6,
50:10, 51:1
**owed** [1] - 49:14
**own** [3] - 28:21, 33:23,
52:25

**P**

**p.m** [1] - 54:12
**paid** [3] - 24:11, 59:22,
64:13
**paperwork** [1] - 3:25
**parade** [1] - 50:5
**parading** [5] - 3:10,
17:3, 34:12, 49:22,
50:3
**paragraph** [14] - 7:23,
8:7, 8:13, 8:17, 9:10,
9:14, 9:18, 9:23,
10:2, 10:4, 10:18,
10:21, 10:22, 26:12
**paragraphs** [1] - 7:25
**part** [5] - 16:10, 20:22,
28:24, 55:1, 57:5
**participate** [1] - 25:12
**participating** [3] -
25:4, 50:8, 56:7
**participation** [1] -
55:22
**particular** [1] - 12:25
**particularly** [2] - 15:1,
58:20

**parties** [3] - 2:3, 12:9, 35:16
**partisan** [1] - 29:2
**partly** [1] - 36:12
**party** [1] - 67:10
**pass** [1] - 29:23
**passed** [1] - 31:12
**past** [4] - 13:2, 13:22, 53:9, 59:18
**path** [2] - 15:1, 52:4
**pause** [2] - 50:25, 56:7
**pay** [8] - 59:16, 61:12, 62:9, 62:12, 62:14, 63:10, 63:13, 63:15
**payable** [1] - 64:8
**paying** [1] - 25:21
**payment** [4] - 49:19, 63:11, 63:16, 63:17
**payments** [1] - 64:1
**peaceful** [12] - 35:13, 36:14, 36:15, 40:21, 45:15, 48:3, 50:11, 57:21, 58:4, 58:18
**peacefully** [1] - 36:11
**Pelosi** [3] - 30:18, 31:7, 53:12
**Pelosi's** [1] - 53:9
**penalties** [4] - 39:18, 62:10, 62:15, 63:16
**penalty** [2] - 63:10, 63:14
**pending** [2] - 18:24, 60:24
**people** [41] - 3:14, 5:11, 5:20, 5:21, 5:24, 6:3, 6:5, 14:10, 28:6, 28:19, 28:23, 28:25, 29:4, 29:11, 29:22, 29:23, 29:24, 30:2, 31:10, 33:3, 34:13, 34:14, 35:16, 35:17, 36:10, 36:11, 36:13, 40:20, 42:8, 42:13, 43:7, 45:17, 46:12, 46:13, 47:4, 50:7, 50:18, 51:19, 52:14, 58:14
**perceived** [1] - 51:7
**perception** [1] - 50:25
**perfect** [1] - 22:15
**perhaps** [4] - 14:13, 16:12, 42:14, 56:8
**period** [15] - 8:10, 8:11, 12:12, 12:14, 21:8, 22:20, 23:16, 23:22, 33:14, 56:22, 59:9, 60:4, 60:11, 62:24, 64:20
**periodic** [1] - 62:4
**periods** [4] - 41:6,

56:8, 61:1, 62:20
**permafrost** [1] - 37:16
**permanently** [7] - 24:10, 25:11, 25:22, 43:23, 44:4, 44:7, 44:11
**permissibility** [1] - 59:7
**permission** [1] - 65:5
**permit** [1] - 52:1
**person** [8] - 3:13, 19:13, 32:16, 33:16, 33:20, 41:21, 48:14, 52:13
**personal** [2] - 5:2, 17:7
**persons** [1] - 28:14
**perspective** [1] - 42:5
**petty** [14] - 3:9, 13:7, 17:3, 23:9, 30:5, 32:19, 34:11, 39:18, 48:1, 49:24, 54:23, 54:25, 55:14
**Pham** [1] - 22:18
**photocopied** [1] - 67:10
**physical** [5] - 14:14, 14:21, 33:23, 52:24, 57:6
**physically** [1] - 52:5
**picketing** [5] - 3:11, 34:12, 49:23, 50:3, 50:6
**place** [5] - 26:17, 34:15, 36:17, 55:12, 56:1
**placed** [1] - 55:3
**placement** [1] - 62:3
**places** [1] - 30:8
**plates** [1] - 46:20
**play** [1] - 13:18
**played** [4] - 16:2, 16:13, 21:20, 27:6
**plea** [14] - 8:3, 8:8, 8:9, 15:10, 15:23, 16:3, 16:7, 25:19, 25:24, 26:11, 34:11, 49:18, 62:7, 65:3
**pleaded** [1] - 3:9
**pleading** [1] - 13:11
**plenty** [2] - 11:25, 46:25
**podium** [1] - 45:2
**point** [9] - 16:4, 20:22, 24:25, 40:2, 41:7, 41:14, 42:4, 51:15, 53:24
**pointed** [3] - 18:14, 20:3, 41:23
**points** [3] - 19:17,

22:14, 26:1
**poked** [1] - 32:16
**police** [49] - 14:14, 14:21, 24:23, 24:24, 24:25, 29:25, 30:18, 31:3, 31:12, 31:18, 32:1, 32:2, 32:3, 33:3, 41:25, 42:7, 42:12, 43:1, 43:12, 43:14, 45:25, 48:16, 50:7, 50:23, 51:1, 51:7, 51:10, 51:12, 51:18, 51:22, 52:4, 52:15, 52:20, 52:23, 52:24, 53:1, 53:25, 54:4, 54:7, 54:16, 55:2, 55:5, 55:7, 57:6, 58:10, 58:12, 58:17, 60:18
**policy** [2] - 25:18, 26:8
**political** [3] - 35:10, 36:6, 60:13
**portions** [1] - 6:17
**position** [2] - 42:11, 44:14
**possess** [1] - 61:23
**possessing** [2] - 56:11, 60:22
**possession** [5] - 10:5, 10:12, 10:13, 20:5, 60:20
**possible** [3] - 6:2, 6:5, 23:2
**posts** [1] - 13:9
**pour** [1] - 55:8
**power** [5] - 35:13, 40:21, 48:4, 50:11, 58:19
**practicable** [3] - 62:25, 66:2, 66:3
**precisely** [2] - 7:4, 8:12
**preclude** [1] - 25:25
**precluded** [1] - 25:19
**premises** [1] - 37:22
**prepared** [4] - 44:13
**preplanning** [1] - 13:8
**presence** [4] - 16:13, 32:13, 33:4, 60:17
**PRESENT** [1] - 1:20
**present** [2] - 6:5, 18:10
**presentation** [1] - 22:6
**presented** [1] - 34:8
**presentence** [8] - 4:8, 6:18, 7:14, 11:14, 12:1, 41:19, 47:15, 64:14
**preserved** [1] - 35:8
**President** [5] - 28:24,

31:21, 33:7, 45:13, 48:17
**President's** [1] - 24:15
**presidential** [3] - 40:21, 48:12, 50:12
**presiding** [1] - 3:23
**press** [1] - 48:18
**presume** [1] - 28:1
**Pretrial** [2] - 1:21, 2:6
**pretty** [3] - 10:15, 20:4, 40:25
**prevent** [1] - 29:5, 51:16, 52:21, 53:21, 60:18
**previous** [1] - 46:23
**previously** [1] - 56:8
**principle** [1] - 51:5
**Prisons** [2] - 62:22, 66:6
**Probation** [5] - 1:20, 2:5, 63:2, 63:6, 64:16
**probation** [35] - 4:4, 4:7, 4:9, 8:2, 8:19, 9:16, 12:2, 12:13, 12:14, 12:15, 23:18, 32:20, 37:25, 47:15, 56:5, 56:8, 58:25, 59:1, 59:14, 60:4, 60:12, 60:25, 61:8, 62:21, 63:8, 63:19, 63:21, 63:25, 64:14, 65:25, 66:9, 66:17, 66:18, 66:19
**probationary** [2] - 8:10, 60:5
**problem** [4] - 33:2, 33:5, 46:21, 46:24
**proceed** [5] - 6:10, 45:6, 46:1
**proceeding** [1] - 66:25
**proceedings** [3] - 3:14, 3:18, 67:6
**Proceedings** [1] - 1:24
**process** [4] - 31:3, 34:20, 48:8, 48:13
**produce** [1] - 37:12
**produced** [1] - 1:24
**Profit** [1] - 36:2
**program** [1] - 63:1
**prohibited** [4] - 3:19, 19:13, 56:10, 60:22
**prohibitions** [1] - 3:19
**promote** [4] - 21:13, 48:6, 49:4, 54:19
**promoting** [1] - 48:20
**pronouncing** [1] - 3:6
**property** [3] - 13:6, 13:23, 28:14
**proportion** [1] - 29:14

**proposed** [1] - 9:9
**propriety** [1] - 59:5
**protect** [3] - 40:24, 49:3, 57:14
**protected** [2] - 50:5, 51:21
**protest** [9] - 28:25, 34:6, 34:15, 34:17, 34:24, 35:19, 36:6, 45:15
**protesters** [1] - 52:4
**protesting** [1] - 50:6
**protests** [1] - 34:4
**proud** [1] - 38:10
**Proud** [1] - 29:3
**Prout** [3] - 2:11, 2:12, 41:15
**PROUT** [34] - 1:12, 2:10, 7:19, 8:9, 8:16, 9:22, 12:18, 17:5, 18:8, 18:22, 19:4, 19:7, 19:15, 20:6, 20:12, 20:17, 20:23, 21:1, 21:3, 22:4, 22:7, 22:13, 25:14, 25:16, 25:24, 26:6, 26:16, 26:21, 27:16, 27:18, 27:21, 65:9, 65:15, 65:21
**provide** [4] - 18:13, 48:22, 49:12, 63:19
**provided** [3] - 11:18, 12:10, 59:14
**provision** [1] - 39:5
**provisions** [1] - 61:5
**PSR** [11] - 7:16, 7:18, 7:23, 7:25, 8:5, 9:7, 9:13, 10:1, 10:18, 11:10, 24:7
**public** [5] - 3:13, 3:16, 40:24, 49:3, 57:14
**published** [1] - 35:24
**punching** [1] - 53:17
**punishment** [4] - 41:7, 41:10, 41:12, 48:22
**purpose** [3] - 48:6, 48:21, 49:3
**purposes** [6] - 40:18, 47:20, 47:21, 47:23, 47:24
**pursuant** [5] - 49:6, 49:20, 61:4, 62:17, 64:18
**Push** [2] - 31:13, 54:4
**push** [4] - 32:4, 53:25, 54:8, 55:5
**pushed** [2] - 25:3, 32:7
**pushes** [1] - 32:9
**pushing** [3] - 24:25,

32:5, 51:23
**put** [4] - 2:22, 15:12, 32:23, 37:9
**puzzled** [2] - 38:23, 40:1

## Q

**qualifies** [1] - 25:10
**questions** [3] - 7:8, 22:5, 44:21
**quite** [1] - 38:9
**quote** [1] - 16:3

## R

**raise** [1] - 43:18
**raised** [1] - 8:24
**raises** [1] - 44:5
**raising** [3] - 24:21, 44:4, 57:4
**rallies** [1] - 25:12
**rally** [4] - 24:15, 43:25, 50:14, 57:2
**range** [1] - 60:5
**ranges** [1] - 39:18
**rates** [1] - 5:19
**rather** [4] - 20:15, 34:21, 48:13, 54:24
**re** [1] - 10:9
**re-filed** [1] - 10:9
**reached** [1] - 51:15
**read** [3] - 24:12, 35:21, 39:3
**real** [2] - 29:4, 36:21
**really** [9] - 14:23, 15:25, 17:6, 18:10, 24:6, 27:10, 28:7, 29:25, 35:6
**reason** [3] - 5:20, 6:2, 46:17
**reasonable** [2] - 19:7, 20:19
**reasonably** [1] - 52:12
**reasons** [2] - 6:25, 36:5
**rebroadcasting** [1] - 3:17
**receive** [1] - 25:11
**received** [6] - 4:1, 37:24, 39:20, 56:5, 56:19, 65:2
**recent** [2] - 55:19, 60:20
**recently** [1] - 20:1
**recidivating** [1] - 41:1
**recidivism** [1] - 41:5
**recognition** [2] -

27:12, 27:19
**recognizing** [1] - 23:2
**recommendation** [10] - 4:9, 7:15, 12:3, 12:14, 12:20, 16:18, 21:10, 23:1, 23:5, 23:15
**recommendations** [4] - 12:11, 16:22, 22:19, 47:16
**recommended** [4] - 12:15, 17:4, 37:25, 38:1
**recommending** [1] - 21:7
**recommends** [1] - 12:11
**record** [13] - 2:9, 3:4, 3:12, 9:1, 9:4, 11:13, 26:3, 29:15, 38:18, 39:21, 41:9, 45:8, 65:8
**recorded** [1] - 38:14
**recording** [2] - 3:17, 46:12
**records** [6] - 11:2, 29:12, 37:8, 39:11, 41:18, 49:11
**red** [1] - 41:4
**referral** [2] - 25:8, 26:8
**referrals** [1] - 25:20
**referred** [1] - 20:10
**reflect** [4] - 21:13, 47:25, 54:18, 60:10
**reflective** [1] - 35:2
**reflects** [1] - 16:11
**Reform** [1] - 61:4
**refrain** [1] - 62:1
**regard** [1] - 20:9
**regarding** [5] - 49:21, 55:16, 58:22, 60:3, 61:25
**regardless** [1] - 20:17
**regret** [1] - 16:1
**regrets** [1] - 27:4
**regrettable** [1] - 17:22
**regulations** [1] - 62:23
**rehabilitation** [1] - 49:5
**Reinforcements** [1] - 54:6
**relationship** [1] - 56:16
**relatively** [1] - 15:5
**release** [6] - 7:24, 8:1, 8:11, 8:18, 63:21, 64:14
**releases** [3] - 32:6, 32:7, 32:8
**relevant** [1] - 47:17

**reliable** [1] - 18:10
**religious** [1] - 63:4
**rely** [1] - 43:20
**remain** [1] - 60:16
**remained** [1] - 36:14
**remembers** [1] - 41:12
**reminded** [1] - 3:16
**remorse** [4] - 13:13, 15:20, 15:24, 26:20
**remotely** [1] - 3:14
**removal** [1] - 3:20
**remove** [2] - 3:1, 27:24
**removing** [1] - 52:3
**repeat** [1] - 51:5
**repeating** [1] - 47:22
**report** [9] - 4:8, 6:18, 7:14, 11:14, 12:2, 41:19, 47:15, 64:15, 65:24
**reported** [1] - 1:24
**reporter** [2] - 38:3, 38:4
**Reporter** [3] - 1:22, 1:22, 67:14
**represent** [1] - 18:25
**Representatives** [2] - 30:17, 53:11
**representing** [1] - 2:11
**represents** [1] - 10:8
**republic** [1] - 35:16
**request** [3] - 4:16, 38:16, 65:5
**requested** [1] - 63:20
**requests** [1] - 60:4
**require** [2] - 6:3, 23:6
**required** [8] - 5:22, 6:5, 39:2, 39:3, 39:14, 40:17, 48:8, 66:2
**requirement** [2] - 28:1, 63:1
**requires** [5] - 6:24, 26:12, 39:5, 39:8, 48:10
**requiring** [1] - 32:15
**residence** [2] - 19:24, 63:3, 64:17
**resides** [1] - 56:17
**resistance** [3] - 16:4, 16:6, 32:7
**resisting** [2] - 32:3, 54:7
**resolve** [5] - 6:19, 23:6, 23:12, 23:18, 23:24
**resolved** [1] - 24:4
**respect** [9] - 21:14, 28:9, 28:17, 36:20,

44:19, 48:7, 48:13, 48:20, 54:19
**respected** [1] - 32:23
**response** [1] - 4:15
**responsibility** [3] - 13:10, 13:12, 15:21
**responsible** [1] - 20:7
**restitution** [9] - 49:12, 49:13, 49:15, 49:16, 49:19, 59:17, 62:6, 62:7, 64:1
**restricted** [2] - 3:21, 63:2
**result** [2] - 3:20, 10:10
**resulted** [1] - 24:9
**resulting** [2] - 18:7, 34:3
**returns** [1] - 59:19
**reversed** [2] - 10:9, 10:25
**review** [4] - 11:5, 17:1, 40:19, 48:11
**reviewed** [5] - 4:7, 4:18, 4:22, 8:4, 11:14
**reviewing** [2] - 3:25, 51:25
**revised** [1] - 35:25
**Revisited** [1] - 35:25
**rewrite** [1] - 8:13
**Richard** [1] - 1:13
**rifle** [2] - 19:25, 56:14
**righteous** [1] - 36:7
**riot** [12] - 16:14, 25:4, 31:11, 34:18, 35:17, 36:3, 36:4, 50:6, 50:10, 54:2, 55:20, 55:22
**rioter** [1] - 21:20
**rioters** [11] - 51:16, 51:23, 52:8, 52:21, 52:22, 53:2, 53:5, 53:16, 55:2, 55:6, 60:18
**Rioting** [1] - 36:2
**riots** [3] - 25:12, 28:6, 36:9
**risk** [2] - 41:1, 41:5
**roam** [1] - 53:6
**role** [5] - 13:1, 16:2, 16:12, 21:20, 27:6
**Room** [1] - 64:6
**rooms** [2] - 14:8, 30:25
**Rotunda** [1] - 54:11
**rotunda** [1] - 29:22
**rowdy** [1] - 46:1
**RPR** [3] - 1:22, 67:3, 67:13
**ruckus** [1] - 46:2

**Rule** [1] - 11:12
**rule** [2] - 21:18, 34:18
**rules** [2] - 61:25, 62:22
**run** [1] - 19:20
**running** [1] - 35:11
**Russell** [1] - 1:13

## S

**safe** [2] - 6:1, 6:4
**safely** [1] - 51:19
**SAINT** [1] - 67:3
**Saint** [2] - 1:22, 67:13
**SAINT-LOTH** [1] - 67:3
**Saint-Loth** [2] - 1:22, 67:13
**sanctions** [2] - 3:20, 3:22
**sane** [1] - 52:12
**satisfied** [2] - 11:22, 26:15
**saved** [1] - 46:5
**saw** [13] - 15:9, 17:7, 24:18, 24:22, 41:25, 45:18, 45:24, 45:25, 46:10, 50:23, 52:13, 58:3
**scaffolding** [1] - 45:18
**schedule** [1] - 63:11
**SCHUCK** [1] - 1:21
**Schuck** [1] - 2:6
**screaming** [3] - 13:25, 46:11, 46:13
**screams** [1] - 31:22
**screen** [1] - 4:5
**screws** [1] - 46:19
**search** [1] - 37:22
**seated** [4] - 3:2, 5:9, 12:6, 65:12
**Second** [1] - 51:24
**second** [6] - 6:20, 14:7, 14:17, 37:13, 53:19, 55:3
**Secret** [1] - 30:17
**Section** [8] - 47:18, 49:6, 49:20, 61:5, 61:14, 62:18, 64:18, 64:23
**Security** [1] - 25:9
**see** [16] - 5:10, 5:11, 23:2, 25:10, 26:24, 29:24, 32:24, 36:12, 42:2, 44:5, 45:16, 46:4, 46:7, 46:8, 50:17, 50:19
**seeing** [3] - 52:13, 54:16, 58:20

**seize** [1] - 37:22
**Senate** [1] - 15:3
**send** [1] - 5:23
**sense** [2] - 29:14, 52:4
**sensitive** [1] - 14:5
**sentence** [33] - 6:23, 6:25, 7:1, 16:16, 16:17, 21:12, 21:25, 23:8, 23:10, 23:19, 23:21, 37:24, 39:10, 40:17, 43:21, 47:12, 47:19, 47:24, 49:10, 54:18, 54:20, 57:13, 57:18, 59:1, 59:4, 59:5, 59:8, 59:11, 61:3, 64:17, 64:19, 64:25, 65:7
**sentenced** [2] - 39:7, 61:7
**sentences** [6] - 16:25, 22:20, 49:9, 56:5, 58:22, 60:5
**SENTENCING** [1] - 1:8
**Sentencing** [1] - 61:4
**sentencing** [49] - 3:4, 3:12, 3:15, 3:24, 4:2, 4:7, 4:9, 4:12, 4:14, 4:19, 6:10, 6:14, 7:14, 10:8, 11:6, 12:2, 12:4, 12:9, 12:10, 12:19, 18:12, 19:16, 20:21, 22:8, 22:12, 28:9, 34:1, 36:18, 36:20, 38:24, 39:4, 39:6, 39:16, 40:16, 40:18, 47:12, 47:13, 47:16, 47:20, 47:21, 47:23, 48:6, 48:21, 48:23, 56:21, 57:16, 58:21, 60:3, 65:4
**sentencings** [1] - 50:2
**separate** [4] - 18:11, 39:25, 55:4, 55:11
**series** [1] - 14:10
**serious** [9] - 19:10, 20:3, 20:4, 21:19, 22:22, 23:23, 48:1, 48:5, 55:13
**seriously** [2] - 28:15, 56:24
**seriousness** [4] - 21:13, 47:25, 54:18, 60:10
**serve** [3] - 31:7, 53:23, 62:18
**served** [2] - 61:10, 62:20
**service** [1] - 12:16
**Service** [1] - 30:17

**services** [2] - 11:23, 63:4
**Session** [1] - 48:11
**set** [8] - 4:3, 6:9, 7:17, 10:3, 38:19, 45:8, 47:17, 53:7
**settled** [1] - 51:9
**seven** [1] - 46:23
**several** [1] - 60:20
**severe** [1] - 24:9
**shall** [6] - 61:15, 62:16, 62:20, 64:1, 64:11, 64:14, 67:8
**share** [1] - 63:22
**sheets** [1] - 63:11
**shelter** [1] - 35:12
**Sherrill** [1] - 64:5
**shield** [3] - 31:11, 54:2, 54:3
**shields** [1] - 43:12
**shoot** [1] - 42:8
**short** [3] - 16:16, 21:7, 43:10
**shorthand** [1] - 1:24
**shortly** [2] - 40:19, 52:18
**shot** [1] - 28:4
**shouting** [2] - 30:19, 58:2
**shoving** [3] - 14:21, 24:24, 52:23
**show** [6] - 11:2, 26:13, 32:16, 54:17, 57:11, 59:19
**showing** [1] - 13:12
**shown** [1] - 26:20
**shows** [2] - 52:25, 54:7, 54:14
**sic** [3] - 21:19, 46:19, 57:11
**siege** [2] - 13:1, 16:2
**signatory** [1] - 67:11
**significance** [1] - 17:13
**significant** [2] - 14:24, 23:24
**signs** [1] - 13:22
**Silver** [15] - 2:14, 2:15, 5:1, 8:21, 10:8, 11:7, 11:10, 11:23, 12:1, 27:22, 32:22, 33:18, 34:1, 37:4, 65:22
**SILVER** [51] - 1:17, 2:13, 5:4, 5:14, 8:23, 9:2, 9:5, 9:8, 9:11, 9:15, 10:23, 11:8, 11:11, 11:16, 11:18, 27:23, 28:3, 29:20, 33:1, 33:19, 34:7, 34:25, 35:4, 35:14,

35:20, 37:1, 37:5, 37:21, 38:22, 40:1, 40:6, 40:11, 40:14, 41:8, 41:14, 42:11, 42:20, 42:22, 42:24, 43:4, 43:9, 43:16, 44:8, 44:13, 44:18, 45:3, 65:11, 65:23, 66:8, 66:15, 66:22
**similar** [6] - 39:7, 39:11, 43:1, 49:11, 57:19
**similarly** [1] - 39:20
**simply** [3] - 22:7, 22:14, 33:2
**single** [3] - 25:23, 48:14, 50:1
**site** [1] - 45:21
**situated** [1] - 39:20
**situation** [5] - 5:18, 17:24, 37:19, 43:3, 51:14
**slap** [1] - 41:11
**slaps** [1] - 41:13
**slowed** [1] - 57:8
**smart** [1] - 23:14
**snarl** [1] - 27:4
**SOARES** [1] - 1:20
**Soares** [2] - 2:5, 9:16
**Social** [1] - 25:9
**social** [2] - 13:9, 26:13
**sociologist** [1] - 35:23
**someone** [2] - 17:22, 54:2
**sometimes** [2] - 27:11, 47:22
**soon** [4] - 62:25, 66:2, 66:3
**sorry** [7] - 22:4, 27:1, 33:17, 37:1, 37:2, 44:25, 47:3
**sort** [1] - 29:22
**sound** [1] - 14:1
**sounding** [1] - 53:10
**sounds** [1] - 20:4
**spaces** [1] - 14:5
**span** [1] - 17:19
**speaker** [1] - 45:12
**Speaker** [5] - 30:16, 52:14, 53:9, 53:11, 53:12
**speaking** [1] - 3:1
**speaks** [1] - 42:15
**special** [6] - 13:16, 23:18, 60:25, 61:9, 61:12, 62:16
**specific** [3] - 8:14, 40:23, 60:7
**specifically** [4] - 26:19, 37:17, 60:16,

63:6
**speech** [1] - 24:16
**spending** [1] - 24:17
**spent** [6] - 14:4, 30:7, 30:24, 54:13, 54:23, 54:25
**split** [9] - 23:8, 23:10, 23:19, 23:21, 59:1, 59:4, 59:5, 59:8, 59:10
**spray** [1] - 54:9
**SSI** [2] - 24:10, 56:20
**stability** [1] - 35:10
**stable** [1] - 56:15
**staff** [3] - 31:21, 48:18
**stairs** [4] - 30:16, 44:2, 53:7, 53:8
**stand** [2] - 11:20, 39:21
**Stand** [2] - 31:23, 31:24
**standard** [1] - 61:16
**Standing** [1] - 3:17
**standing** [3] - 24:16, 27:12, 43:25
**stands** [1] - 11:3
**start** [3] - 7:13, 12:17, 54:14
**started** [2] - 28:8, 35:2
**state** [11] - 2:8, 7:25, 8:3, 8:10, 20:8, 27:1, 55:10, 60:24, 61:3, 61:21, 61:25
**State** [1] - 18:21
**statement** [3] - 8:18, 47:8, 47:9
**statements** [4] - 26:22, 26:23, 27:3, 60:9
**STATES** [3] - 1:1, 1:3, 1:9
**states** [2] - 7:23, 8:10
**States** [4] - 2:3, 2:11, 21:17, 31:21
**status** [1] - 19:21
**statute** [5] - 19:19, 39:3, 39:5, 49:14, 50:2
**statutes** [1] - 49:15
**statutory** [1] - 64:20
**stay** [2] - 47:6, 50:20
**stayed** [1] - 24:15
**steadily** [1] - 56:18
**Steal** [2] - 28:25, 46:25
**stemming** [1] - 55:11
**stenographic** [1] - 67:5
**Stenz** [1] - 22:17
**step** [8] - 6:15, 6:20,

6:24, 7:6, 7:13, 12:8, 45:1, 54:10
**stepping** [1] - 24:2
**steps** [1] - 6:15
**still** [8] - 16:12, 31:20, 33:22, 39:24, 40:7, 40:8, 40:10, 56:17
**stolen** [1] - 43:13
**stones** [1] - 24:2
**stood** [1] - 24:6
**Stop** [2] - 28:24, 46:25
**stop** [5] - 31:3, 42:1, 42:8, 50:24, 51:2
**stopped** [2] - 52:5, 52:22
**straight** [2] - 32:20, 45:8
**stranger** [1] - 41:21
**Street** [1] - 52:2
**stretch** [1] - 17:17
**strictly** [1] - 3:19
**stuck** [1] - 30:4
**stupid** [1] - 46:18
**subject** [4] - 23:10, 23:17, 58:24, 60:12
**subjects** [1] - 59:13
**submissions** [1] - 59:5
**submit** [4] - 16:15, 44:19, 62:2, 62:24
**submits** [1] - 15:14
**submitted** [8] - 4:10, 4:12, 4:13, 4:19, 5:1, 13:25, 37:10, 47:14
**substance** [4] - 61:24, 62:1, 62:2, 63:4
**substantial** [2] - 33:14, 60:1
**succeeded** [1] - 55:7
**success** [1] - 16:14
**successful** [1] - 34:19
**sufficient** [2] - 47:19, 57:17
**sufficiently** [1] - 23:23
**suggested** [1] - 14:12
**suggests** [1] - 10:24
**summary** [1] - 16:24
**summoned** [1] - 5:22
**supervised** [5] - 7:24, 8:1, 8:11, 8:18, 66:16
**supervision** [9] - 26:7, 41:6, 60:13, 61:15, 61:17, 61:19, 62:3, 66:13, 66:20
**supplemental** [1] - 10:17
**supplemented** [1] - 4:15
**support** [4] - 5:8,

33:15, 33:23, 52:2
**supposed** [2] - 46:16, 49:7
**Supreme** [3] - 10:6, 23:25, 24:5
**surge** [1] - 31:13
**surges** [1] - 54:4
**SW** [1] - 1:14
**system** [2] - 4:21, 56:6

## T

**table** [2] - 17:11, 32:24
**tactic** [1] - 43:1
**talks** [1] - 36:9
**taunting** [1] - 53:10
**tax** [1] - 59:19
**taxpayers** [1] - 24:11
**tear** [6] - 14:11, 30:20, 32:5, 32:8, 32:15, 43:10
**technically** [2] - 16:5, 32:12
**technology** [1] - 63:7
**Ted** [1] - 1:14
**teleconference** [1] - 3:16
**telephone** [1] - 2:7
**tempting** [1] - 59:7
**ten** [1] - 30:3
**tend** [1] - 36:9
**tens** [1] - 29:18
**term** [11] - 7:23, 8:1, 8:3, 8:18, 8:19, 17:4, 58:24, 59:2, 60:24, 61:7, 66:12
**terms** [2] - 18:18, 29:10
**terrible** [6] - 27:7, 27:9, 28:7, 29:12, 35:7, 36:8
**terribly** [1] - 17:16
**terrorized** [1] - 48:19
**test** [1] - 62:3
**tests** [1] - 62:4
**thankfully** [1] - 53:12
**THE** [125] - 1:1, 1:9, 1:12, 1:17, 2:2, 2:12, 2:15, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:24, 2:25, 3:7, 3:8, 5:10, 5:15, 5:16, 5:17, 7:11, 7:12, 8:7, 8:12, 8:21, 8:25, 9:4, 9:6, 9:9, 9:12, 9:20, 9:23, 11:4, 11:9, 11:12, 11:17, 11:19, 11:24, 11:25, 12:5, 12:6, 12:7, 12:8,

16:23, 18:5, 18:18, 19:2, 19:6, 19:12, 19:23, 20:10, 20:16, 20:22, 20:24, 21:2, 22:3, 22:5, 22:11, 23:4, 25:15, 25:19, 26:5, 26:10, 26:18, 27:8, 27:17, 27:20, 27:22, 27:25, 29:17, 29:21, 33:17, 33:25, 34:10, 35:1, 35:13, 35:15, 36:24, 37:3, 37:20, 38:20, 38:23, 40:5, 40:10, 40:13, 40:15, 41:9, 41:22, 42:18, 42:21, 42:23, 43:3, 43:6, 43:10, 43:18, 44:10, 44:16, 44:23, 44:25, 45:1, 45:4, 45:6, 45:7, 47:6, 47:10, 47:11, 51:8, 51:9, 57:24, 58:1, 58:3, 58:8, 58:10, 58:14, 58:16, 58:18, 65:10, 65:12, 65:18, 65:22, 66:1, 66:11, 66:18, 66:24
**thefts** [1] - 28:14
**themselves** [1] - 52:3
**thereafter** [1] - 62:4
**therefore** [2] - 62:10, 62:14
**thinking** [3] - 28:8, 37:2, 37:3
**third** [3] - 10:6, 10:11, 55:9
**thoughtful** [1] - 23:14
**thousand** [1] - 59:23
**thousand-dollar** [1] - 59:23
**three** [12] - 6:14, 19:24, 22:16, 23:5, 23:15, 51:22, 55:18, 59:18, 59:21, 61:10, 62:20, 62:25
**threshold** [1] - 14:2
**timing** [1] - 31:19
**titanium** [1] - 46:19
**titled** [1] - 50:2
**today** [5] - 12:22, 20:21, 21:10, 60:9, 65:19
**took** [3] - 23:14, 26:17, 56:1
**total** [5] - 54:13, 59:20, 61:9, 62:18, 63:16
**totality** [1] - 16:15
**toward** [1] - 53:25
**towards** [2] - 31:13,

54:4
**traced** [1] - 15:2
**traffic** [1] - 18:1
**transcript** [5] - 1:24, 67:5, 67:6, 67:8, 67:9
**TRANSCRIPT** [1] - 1:8
**transcription** [1] - 1:24
**transferred** [2] - 66:9
**transferring** [1] - 66:11
**transition** [5] - 40:21, 48:3, 50:11, 58:4, 58:19
**transitions** [1] - 35:13
**transmission** [1] - 5:19
**travel** [1] - 53:4
**traveling** [1] - 14:6
**treatment** [1] - 63:5
**trial** [1] - 10:5
**tried** [2] - 10:24, 51:13
**trouble** [8] - 29:4, 29:5, 29:12, 33:13, 45:10, 46:14, 47:1, 58:12
**troubles** [1] - 38:18
**troubling** [3] - 13:9, 40:15, 54:22
**true** [5] - 16:5, 22:1, 52:3, 67:4, 67:5
**truly** [2] - 24:1, 52:15
**Trump** [2] - 28:24, 45:14
**try** [3] - 42:1, 50:24, 57:22
**trying** [10] - 24:23, 25:1, 31:18, 31:24, 32:4, 33:13, 46:9, 52:15, 53:21, 57:24
**turn** [4] - 9:12, 14:25, 24:6, 37:18
**turned** [3] - 21:6, 30:5, 53:3
**Turner** [1] - 1:14
**TV** [1] - 38:3
**two** [30] - 12:8, 14:14, 16:20, 17:24, 18:21, 21:11, 21:12, 24:18, 28:4, 36:21, 37:10, 39:25, 40:3, 41:4, 44:1, 50:15, 51:21, 52:10, 55:2, 55:4, 55:11, 55:21, 56:17, 57:2, 57:5, 59:21, 60:17, 61:23, 62:4, 66:20
**type** [3] - 13:5, 26:8, 30:5

**types** [2] - 49:9, 58:22
**typically** [1] - 41:5

## U

**U.S** [7] - 20:11, 63:2, 63:6, 63:22, 64:2, 64:9, 64:16
**U.S.C** [10] - 20:5, 47:18, 49:6, 49:20, 49:24, 61:5, 61:13, 62:17, 64:18, 64:23
**ultimate** [1] - 22:20
**ultimately** [7] - 18:16, 23:25, 24:3, 43:6, 53:3, 59:6, 66:19
**unable** [1] - 65:4
**unavailable** [1] - 64:25
**uncomfortable** [1] - 37:19
**under** [4] - 3:16, 20:5, 39:2, 48:19
**underlying** [1] - 18:6
**understood** [2] - 9:5, 30:11
**unfortunately** [1] - 13:18
**Unheavenly** [2] - 35:24, 35:25
**unique** [1] - 28:7
**United** [4] - 2:3, 2:11, 21:17, 31:21
**UNITED** [3] - 1:1, 1:3, 1:9
**University** [1] - 35:23
**unlawful** [7] - 51:2, 51:3, 51:7, 51:10, 55:9, 60:20, 62:2
**unlawfully** [3] - 48:15, 50:7, 61:23
**unnecessary** [1] - 59:7
**unusual** [1] - 27:14
**unwarranted** [4] - 22:8, 39:6, 49:10, 60:3
**up** [13] - 5:13, 7:10, 8:1, 23:14, 24:16, 27:4, 29:18, 30:15, 31:14, 44:2, 44:15, 58:25, 66:17
**upstairs** [1] - 53:14
**USA** [3] - 30:13, 31:14
**USAO** [1] - 1:12

## V

**vacated** [1] - 10:25

**vaccinated** [4] - 2:18, 2:20, 2:25, 28:2
**valiantly** [1] - 25:1
**valid** [1] - 26:1
**valued** [1] - 35:8
**varying** [1] - 22:25
**vaxxed** [1] - 6:3
**verdict** [1] - 10:4
**versus** [1] - 2:3
**via** [2] - 2:6, 2:7
**Vice** [2] - 31:21, 48:16
**victim** [1] - 64:3
**victims** [1] - 49:12
**video** [12] - 2:6, 4:5, 14:16, 14:19, 24:12, 26:18, 37:9, 44:5, 46:7, 46:10, 50:19, 57:4
**videoconference** [1] - 3:18
**videographer** [1] - 30:21
**videos** [10] - 4:18, 4:22, 15:14, 24:19, 24:21, 31:9, 32:16, 51:20, 58:1, 58:3
**view** [2] - 22:21, 32:21
**viewed** [1] - 35:18
**views** [4] - 23:7, 34:5, 34:7, 35:3
**violates** [1] - 66:12
**violation** [2] - 3:19, 49:24
**violence** [15] - 13:6, 13:22, 14:12, 15:9, 15:16, 26:24, 28:13, 31:15, 32:11, 32:12, 32:14, 33:3, 41:17, 52:10, 60:13
**violent** [5] - 17:16, 20:2, 36:12, 36:15, 55:25
**voices** [1] - 45:15
**void** [1] - 67:9
**volatile** [1] - 51:13
**voluntarily** [2] - 5:22, 5:25
**voluntary** [1] - 37:10
**vote** [2] - 33:8, 34:22
**votes** [1] - 48:12
**vs** [1] - 1:4
**Vuksanaj** [36] - 2:4, 2:14, 2:16, 2:18, 3:5, 3:8, 4:2, 5:15, 6:8, 6:22, 10:24, 11:15, 11:20, 18:19, 28:16, 28:18, 29:8, 33:6, 33:7, 34:8, 38:20, 38:24, 41:24, 44:21, 44:23, 45:3, 45:6,

47:7, 49:4, 49:9,
58:1, 58:9, 60:8,
61:7, 65:24, 66:12
**VUKSANAJ** [1] - 1:5
**Vuksanaj's** [4] - 4:6,
28:10, 28:13, 29:15

## W

**waived** [1] - 63:9
**waives** [2] - 62:10,
62:14
**walk** [4] - 24:19,
45:14, 50:21, 57:2
**walked** [3] - 14:9,
15:6, 24:17
**walking** [4] - 13:22,
44:1, 57:3
**Wall** [1] - 52:2
**wall** [11] - 25:2, 32:2,
32:6, 32:9, 32:14,
46:3, 46:4, 46:6,
46:7, 46:8, 46:9
**wandered** [1] - 53:15
**wants** [2] - 42:15,
48:25
**warning** [1] - 5:21
**warrant** [2] - 37:22,
39:17
**warrants** [1] - 23:22
**Washington** [9] - 1:6,
33:6, 43:24, 46:23,
47:1, 64:6, 64:10,
66:14
**watched** [1] - 24:11
**watching** [1] - 43:25
**water** [1] - 35:11
**waves** [1] - 53:24
**ways** [3] - 17:23, 22:9,
22:10
**wear** [1] - 6:4
**weeks** [2] - 28:4,
55:21
**weigh** [2] - 21:24,
22:24
**weighs** [2] - 43:20,
58:19
**White** [1] - 24:17
**whole** [1] - 20:22
**wife** [3] - 5:7, 15:11,
35:9
**wife's** [1] - 59:19
**window** [2] - 45:22,
52:9
**windows** [1] - 50:18
**wing** [1] - 15:3
**wish** [2] - 7:7, 45:2
**wished** [1] - 27:2
**withdraw** [3] - 10:20,

10:21, 11:3
**witness** [1] - 52:10
**witnessed** [2] - 14:22
**witnessing** [2] -
50:19, 55:1
**woman** [1] - 31:21
**word** [2] - 34:25, 35:4
**words** [2] - 21:15,
27:5
**worn** [1] - 31:17
**worse** [2] - 38:13, 43:2
**worth** [1] - 25:17
**wrist** [2] - 41:11, 41:13
**wrote** [1] - 35:23

## Y

**year** [3] - 7:24, 8:19,
62:21
**years** [9] - 8:2, 8:20,
17:19, 35:21, 51:25,
56:18, 59:18, 59:21,
61:8
**years'** [1] - 58:25
**yell** [2] - 31:13, 54:3
**yelling** [3] - 31:9,
31:23, 44:2
**yells** [2] - 31:22, 54:2
**York** [11] - 5:16, 5:17,
5:18, 10:7, 18:21,
20:11, 24:13, 50:13,
55:11, 55:23, 60:24
**you-all** [1] - 39:2
**youngster** [1] - 17:23
**yourself** [1] - 58:9